UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERGE HELENE LTD.,

                Plaintiff,

v.

GE OIL & GAS, INC. and JOHN DOES 1-10,

                Defendants.

C.A. NO. 4:08-cv-02931
DIVERSITY

## FIRST AMENDED COMPLAINT

Plaintiff Berge Helene Ltd., for its complaint against GE Oil & Gas, Inc. and John Does 1-10, alleges as follows:

## SUMMARY OF CASE

1.      This is an action for breach of warranty, arising out of the failure to perform to promised specifications of three reciprocating compressors, which were manufactured and sold by the defendant GE Oil & Gas, Inc. ("GE"), the said failure having caused damages to the Plaintiff in excess of twenty-one million dollars.

## JURISDICTION AND VENUE

2.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), the amount in dispute being in excess of the statutory minimum, plaintiff being a Bermuda corporation, and the named defendant being a Delaware corporation with a principal place of business in Houston, Texas.

3.      Venue is properly set in this Court pursuant to 28 U.S.C. § 1391.

## PARTIES

4.      Plaintiff Berge Helene Ltd. is a corporation organized and existing under the laws of Bermuda.

5.      Defendant GE is a Delaware corporation, with a principal place of business in Houston, Texas. GE may be served pursuant to Rule 4(h)(1)(B) of the Federal Rules of Civil Procedure by delivering a copy of the Summons and of the Complaint to GE's registered agent for service of process, C.T. Corporation System, 350 N. Saint Paul Street, Dallas, Texas 75201-4240. In addition, GE may be served pursuant to Rule 4(h)(1)(A) of the Federal Rules of Civil Procedure by delivering a copy of the Summons and Complaint to its agent Michael W. Gregory, Secretary, and/or its agent, Jose Dumenigo, Vice-President, at GE Oil & Gas Inc., 2707 N. Loop W, Houston, Texas 77008-1051.

6.      John Does 1-10 are other entities or associations affiliated with GE, whose identities are currently unknown to Plaintiff, which were or may have been involved in the manufacture and sale of the compressors at issue in this lawsuit. To the extent that any such entities or associations exist, GE is asked to identify them in its answer, to notify them of these proceedings, and to alert them to Plaintiff's intention to move to amend the Complaint to include them as defendants, with all claims herein relating back to the date of filing of the Complaint pursuant to Fed. R. Civ. P. 15(c)(1)(C)(i).

## FACTS

7.      On or about October 15, 2003, Bergesen d.y. Offshore AS ("Bergesen"), tendered an offer to Woodside Mauretania Pty. Ltd. ("Woodside"), under the terms of which Bergesen offered to provide the services of a Floating Production, Storage and Offloading unit ("FPSO") for use in the Chinguetti oil field in the ocean off the coast of Mauretania.

2

8.     An FPSO is, as the name suggests, a floating unit, which is used in the storage and production of petroleum products.  FPSOs are often maintained in a fixed location for extended periods of time in or near an oil field at sea, as was the case in respect of the FPSO offered to Woodside, which was to be (and has in fact been) fixed in a single location throughout the multi-year duration of the contract described more fully below.

9.     One of the functions of an FPSO is to process the components of a well stream, which generally comprise petroleum, water, and gas.  The petroleum is isolated and stored, the water is cleaned and returned to the sea, and the gas is compressed and either reinjected into the seabed for storage and to avoid flaring, or injected into the wells for purposes of generating lift, thereby facilitating the extraction and movement of petroleum products from beneath the seabed.

10.     The particular FPSO whose services were offered to Woodside was the FPSO BERGE HELENE, the ownership of which has been transferred between several related entities in the period 2001 to the present, including Bergesen, Berge Helene Offshore AS, and the Plaintiff herein, Berge Helene Ltd.

11.     As negotiations with Woodside progressed in early 2004, bids were solicited by Bergesen for various components and systems to be installed upon the FPSO.

12.     One of the systems put out for bid was a gas compression system known as the M60 gas injection module.  The specifications for this system had been made known to potential bidders and, as ultimately stated in the contract entered into with Woodside (as more fully described below), included the following:

> The Gas Compression System shall be designed to compress up to 70 MMSCFD of gas to 3300 psia.  The compressed gas can be used for gas injection at 3300 psia or throttled down to 2900/2750 psia for lift gas purposes.
>
> The Gas Compression System shall be based on 3 x 33% 3 stage reciprocating compressors, each rated for 23.5 MMSCFD, and a

3

> common gas dehydrating system. The reciprocating compressor
> packages are complete with fixed speed electrical motors,
> softstarters, lube oil systems, etc.

13.     The market for reciprocating compressors is limited.   Among the very few

recognized manufacturers of reciprocating compressors are GE and an entity named Ariel.

14.     In light of the foregoing, bids for the M60 gas injection module were solicited

from only two sources.   The first, GSI, was a so-called "packager" of compressors manufactured

by Ariel, and presumably would have purchased compressors directly from Ariel for resale

onward.   The other contractor, ABB Offshore Systems AS ("Aibel"),[1] formed a cooperation with

GE and an entity named Flotech, which was a packager of compressors manufactured by GE.

15.     On information and belief, packagers are generally involved to some extent in the

design of compressor systems sold to buyers and also play a role in the physical construction of

the compressor systems and/or the frames containing the compressors prior to delivery.

16.     GE manufactures reciprocating compressors not only in the United States but also

in Italy, GE having purchased the Italian company, Nuovo Pignone, some years ago.   On

information and belief, crank cases are manufactured in Italy, cylinders are manufactured in the

United States, and final assembly is performed in the United States.   Also on information and

belief, GE provides project-specific design services and customer support for its compressors

from corporate offices in Houston, with manufacturing being performed in Texas and Wisconsin.

17.     In response to the bid solicitation referenced above, Aibel offered to provide GE

gas compressors that were hybrid machines, manufactured by GE in part in the United States and

in part in Italy, and which were to be packaged into a module (the "M60 Module") by Flotech.

---

[1]     ABB Offshore Systems AS changed its name on July 17, 2004, to Vetco Aibel AS.  The entity's name was
changed once again, to Aibel AS, on February 28, 2007.

18.     In order to promote its bid, Aibel arranged for representatives of GE and Flotech, which Aibel described in an email dated January 23, 2004, as Aibel's cooperation partners and as heavyweights with many references ("tunge aktører med mange referanser") to visit the Bergesen offices in Oslo, Norway.

19.     The scheduled meeting took place in the afternoon of February 5, 2004, and was attended by GE's sales and marketing manager from Houston, Coleman de Jong.  De Jong represented that Bergesen's needs could be handled by GE's SHMB compressors, that there would be "no problems" in the use of the SHMB-604 compressors aboard an FPSO, and that the compressors would be problem-free in the event that Bergesen opted to purchase them.

20.     At the meeting, de Jong also provided Bergesen with a computer disk, which contained generic material aimed primarily toward packagers rather than end users, but which included (a) a list of GE sales contacts, all of which were employed in GE's Houston offices, (b) a policy manual for GE packagers prepared by representatives of GE's Houston offices, and (c) a description of a certain sizing software (GE EZ Size), which presumably was to be used in matching customer needs to available GE compressors.

21.     At the meeting, Bergesen requested that GE provide references with respect to the SHMB compressors, and GE undertook to provide such references.

22.     The day following the meeting, Aibel forwarded GE promotional materials to Bergesen by email.  The promotional material referenced de Jong by name and described the capabilities of the Gemini SHMB-604 compressor.  The covering email stated:

> Find enclosed a short technical description of the selected Gemini
> SHMB604 compressor together with a preliminary GA dwg. The
> SHMB compressor is of fully balanced design, enabling a
> reduction in vibration levels down to 70 percent and making it an
> ideal selection for a complete module installation for offshore

5

applications. Gemini and Nuovo Pignone have numerous offshore references for the SHMB compressors.

For the revised / original case (70 MMSCFSD, 3300 psig discharge) it is required with a min. pressure of 13 bara (12 barg, 174 psig discharge) in the HP separator. *The duty can be achieved with 3 off 23.38 MMSCFD Gemini SHMB-604 machines. . . .*

(emphasis added).

23.     A few days after the February 5, 2004 meeting, Bergesen was provided with a pamphlet bearing the logos of Aibel, Flotech and GE, as well as the logo of the Gemini Gas Compressors division of GE (which on information and belief is based in Houston). The pamphlet bore the title: "Presentation of Gas Compressor Solution to Bergesen Offshore for FPSO Gas Lift & Reinjection Applications." The pamphlet, which contained data that was apparently compiled on or about February 9, 2004, indicated that the presentation was made by Flotech "[i]n cooperation with GE Oil & Gas and ABB Offshore Systems," and noted that GE "will provide advice on the package design."

24.     The pamphlet, consistent with the email forwarded by Aibel on February 6, 2004, also recommended three SHMB-604 compressors. Calculations were included, reflecting MMSCFD capacities well over the 23.3 per compressor required by Bergesen, with an assumed operating speed of 1190 rpms.

25.     The pamphlet also provided the references that GE had undertaken to provide at the meeting on February 5, 2004.

26.     GE was involved in the pamphlet's preparation and/or was aware that Aibel and Flotech were representing to Bergesen, consistent with prior representations, that three SHMB-604 compressors would meet Bergesen's requirements.

6

27.     In the days after the referenced meeting of February 5, 2004, another computer disk was also provided to Bergesen.  This face of the disk bore Flotech's logo, but the disk's contents comprised promotional materials prepared by GE and bearing GE's logo, entitled: "GE Oil & Gas: Update on High Speed Reciprocating Compressors."  The materials contained on the disk, in addition to touting GE's compressors, identified key contact persons at "GEPS [sic] Oil & Gas in Houston."  The disk also contained an animated depiction of the operation of a GE reciprocating compressor.

28.     Aibel sent an email to Bergesen on February 20, 2004, in which it stated, among other things:

> *GE Oil & Gas  (Gemini / Nuovo Pignone) will overview this whole process, in effect taking an audit role.*  Thus we have a design process by an experienced team (ITL/Flotech) with checking and validation by Beta (who have extensive experience with near exact same applications) and *audit / overview by GE Oil & Gas – providing a third layer of quality assurance.*

(emphasis added).  Attached to the email was a chart generated by Flotech, confirming that the design would be verified by GE and that GE would be involved in preparation of the final documentation for the compressors.

29.     Aibel, Flotech and GE were at all times aware of the fact that the three compressors were to be installed aboard the FPSO BERGE HELENE for use in satisfying the duties of Bergesen or a Bergesen affiliate under a contract to be entered into with Woodside, and were further aware that the contract between the Bergesen entity and Woodside would require a minimum rate of gas compression of 70 mmscfd.

30.     In reliance on the representations described above, Bergesen d.y. ASA, a publicly traded company that from time to time acted as the operator or manager of the BERGE HELENE, issued a letter of intent to Aibel, indicating its intent to enter into a contract with Aibel

7

for the supply of the M60 gas compressor module and other items of equipment to be installed topside aboard the BERGE HELENE. The letter of intent stated that the contract would be executed if a contract were secured with Woodside.

31.     Thereafter, a meeting was held between representatives of Woodside, Aibel and Bergesen on May 25, 2004. At that meeting, there was a discussion of the fact that specifications required the compressors to provide 70 mmscfd of compression throughout the FPSO's field life, and it was confirmed that each compressor could in fact provide 23.33 mmscfd, or 69.99 mmscfd in total, for this period.

32.     In reliance on the representations described above, a contract was entered into on May 29, 2004, between Berge Helene Offshore AS, which was an affiliate of Bergesen and which was either as of this date or in any event subsequently the owner of the FPSO BERGE HELENE, on the one hand and Woodside on the other hand, which required Berge Helene Offshore AS and the BERGE HELENE, to provide, among other things, 70 mmscfd of compression, failing which Woodside would be entitled to reduce the day rates otherwise payable to Berge Helene Offshore AS under the contract. The specifications quoted in paragraph 22, above, were included in the contract.

33.     In reliance on the representations described above, Bergesen d.y. ASA entered into a contract with Aibel on June 24, 2004, for supply of the M60 gas compressor module and other items of equipment to be installed topside aboard the BERGE HELENE. The specifications for the compressors as set forth in the contract between Bergesen d.y. ASA and Aibel included the language set forth in paragraph 22 above, and also included the following: "Gas Compression System. Discharge Pressure (max): 3 315 psia at swivel inlet Gas Compressors: capacity 3 x 23.3 MMSCFD"

8

34.     After the contract was signed between Bergesen d.y. ASA and Aibel, GE commenced construction of the compressors, a process that was performed in substantial part in the United States.   Further design work and performance calculations with respect to the compressors were also conducted in the United States during the summer of 2004.

35.     The compressors were thereafter factory tested, in the period October-November 2004, at GE's manufacturing and assembly facility in Oshkosh, Wisconsin.

36.     The factory testing was conducted by GE in the presence of representatives of the Houston office of Det Norske Veritas, a classification and testing agency.

37.     Despite its knowledge that the compressors were to be operated at 1190 rpms, GE conducted the testing at its Oshkosh plant at only 960 rpms.   Accordingly, the testing did not simulate actual future operating conditions.

38.     According to the schedule of critical dates set forth in the Bergesen/Woodside contract, the M60 gas compression module was to be delivered to the shipyard for installation aboard the BERGE HELENE by April 13, 2005, and the FPSO was to be ready to leave the shipyard on September 12, 2005, and prepared for hookup off Mauretania on November 2, 2005.

39.     GE delivered the compressors to Flotech on a date after October 7, 2004, and the compressors were thereafter "packaged" into three skids by Flotech/Aibel in Thailand and delivered to Bergesen d.y. ASA at the shipyard in Singapore March 25, 2005.

40.     Upon delivery or shortly thereafter, Aibel provided final documentation for the M60 compressor module, which included a Compressor Selection Data Sheet bearing the heading "Gemini Gas Compressors," which provided a calculation of the output of the units. This document, which on information and belief was prepared by GE or using  GE software, reflected that each of the three compressors could provide 23.39 mmscfd of compression.

41.     The compressor module was thereafter installed aboard the FPSO BERGE HELENE.

42.     On or about September 5, 2005, in connection with a reorganization of the Bergesen family of companies, the BERGE HELENE was transferred by Berge Helene Offshore AS to Plaintiff herein, after which, by deed of assignment dated October 6, 2005, Berge Helene Offshore AS also assigned to Plaintiff all of the former's rights and obligations under its contract with Woodside.

43.     Testing of the compressors aboard the BERGE HELENE commenced on or about October 28, 2005.

44.     Equipment failures were encountered almost immediately thereafter, and continued for a period of many months.

45.     The paragraphs that follow detail some but not all of the problems encountered with the three compressors, which will henceforth be referred to, respectively, as Unit A, Unit B, and Unit C.

**Unit A**

46.     On or about May 5, 2006 it was discovered that five of eight valve plates on Unit A were either cracked or broken. This resulted in a change in the valves that had previously been called for in the compressor design. Low lift valves were thus installed on the first stage not only of this unit but also on the other two compressors. The original design had called for low lift valves on only stages two and three.

47.     On July 11, 2006, the "con rod big end bearing" of Unit A failed, this incident constituting a major compressor failure.

48.   On October 2, 2006, compressor A was shut down once again due to a gas leak and was stopped due to heavy vibrations.

49.   Thereafter, on November 3, 2006, the second stage piston rod on Unit A failed, this second major failure likely also being a result of the overloading of the unit.

### Unit B

50.   On May 8, 2006, the third stage cylinder of Unit B "sheared from its distance piece," this incident constituting a major compressor failure.   This incident resulted from the failure of ten bolts, which were subsequently analyzed by Anderson & Associates, a consulting firm in Houston, Texas that had been engaged by GE.   That firm concluded that the bolts (which did not comply with the specifications for the type of bolts they were marked as being) failed due to high cycle fatigue cracking.   In response to this finding, GE modified its design of the adapter plate to alleviate strain on the bolts.   The unit was then rebuilt in July, but a newly delivered piston rod was found to be too short.   The new rod arrived on August 8, 2006 and Unit B was restarted on August 12, 2006, after having been out of service for over three months.

51.   On September 11, 2006, another major failure occurred when the second stage piston and crosshead flange on Unit B failed, and the bolts connecting the piston rod to the crosshead flange were found to have broken.   The problem was ultimately traced to four crosshead flange stud bolts that had been improperly torqued upon assembly of the unit, in part because of the confusion created by the GE manuals, which (by virtue of the product being partly manufactured in the United States and partly in Italy) apparently mixed metric and imperial torque measurements.   The unit was again out of operation until September 28, 2006.

11

52.    Unit B suffered a third major failure on October 16, 2006, when an O-ring failed and the packing box on the third stage cylinder suffered severe damage.  It was restarted for two hours on November 2, 2006, but was shut down thereafter until it could be rebuilt.

### Unit C

53.    On September 9, 2006, the third stage piston rod on Unit C failed.  Initial reports suggested the possibility that this major failure was due to liquid in the system.  At the present time, however, Aibel and Plaintiff have concluded that this failure, like the others, was due to the overloading of the compressors and inadequate design and testing of the compressors by GE.

54.    Numerous other, less catastrophic failures of all three compressors occurred throughout the time period discussed above, most of which were due to GE's failure properly to design and manufacture the units.

* * *

55.    Direct contact between representatives of GE and representatives of the Plaintiff continued throughout much of the timeframe discussed above and thereafter.  In the period between June 7, 2006 and October 10, 2006, there were at least twenty-nine telephonic conference calls between GE personnel and, among others, Plaintiff's representatives in Norway and aboard the BERGE HELENE, regarding the ongoing problems with the compressors aboard the FPSO.  Records of these telephone conferences suggest that they were initiated from and directed by GE's Houston offices.

56.    Later, a four-day workshop to address the problems being encountered with respect to the compressors aboard the BERGE HELENE, was held in Oslo on November 27-30, 2006, and was attended by GE personnel and representatives of the Plaintiff, together with others.  At

12

this meeting, a GE representative, David Sandquist, said that GE was "confident we [will] get this right."

57. In a telephone conversation with Aibel on or about December 14, 2006, however, GE stated its belief that the compressors were "most probably overloaded," and asked for time to verify its calculations and further assess the situation.

58. On or about December 28, 2006, GE informed Aibel that certain rod and pin loadings were beyond allowable limits when modeled with current operating conditions, and that the compressors could not operate safely in their current build configuration at the operating conditions as originally specified. GE thus proposed a reduction of the bore of certain cylinders and new valve settings and types, which would allow the compressors to operate, but which Aibel believed would reduce their compression capacity by some 13.6%.

59. Another meeting dealing with problems affecting the three compressors, also involving GE personnel and representatives of the Plaintiff, was held in Florence, Italy, on January 4-5, 2007.

60. At the Florence meeting, GE represented that steps could be taken such that the reduction in capacity would be only some 5-6%, and it was decided to implement the measures that it had been said would result in this reduction, i.e. reduction of the bore of the compressors' second-stage cylinders from 9.5 inches to 9 inches.

61. Thereafter, however, it was found necessary, based on recommendations from the manufacturer of the valves used in the compressors, to reduce the suction of the compressors, which led to a total reduction of compression capacity of some 22.6%

62. Specifically, after the modifications, each unit was delivering some 18 mmscfd instead of the contracted-for 23.33 mmscfd. GE indicated that this capacity shortfall could be

13

improved to some 10-12% below contract specifications, but Aibel reported that the steps GE had proposed to effect this improvement would have to be rejected because they would cause extraordinary wear on valves and unduly increase maintenance costs.

63.   Another meeting dealing with problems affecting the three compressors, also involving GE personnel and representatives of the Plaintiff, was held in Florence on October 11, 2007.

64.   The compressors continue to perform below the contractually agreed level.

65.   Both the failure of the units with resultant downtime and the continuing inability of the compressors to function as contracted for can be blamed upon GE for various reasons, including: (A) the failure of GE properly to design the system or to verify Flotech's design as it was represented that GE would do; (B) the use by GE of flawed proprietary softwares to calculate compressor performance; (C) the provision of a prototype hybrid machine, built in part in the United States and in part in Italy, which led to problems with respect to metric versus imperial measurements and resultant issues such as improper bolt torquing, which contributed to one or more of the equipment failures; (D) The failure to test the units at the 1190 rpm for which they were rated, instead testing them at only 960 rpms; thereby never testing the machines under conditions they were likely to encounter during their intended use aboard the FPSO, of which use GE was well aware.

66.   Other defects in the GE design or in the units as delivered include, but are not limited to: (A) use of improper materials for piston rings, sealing rings, and O-rings, (B) use of valves and valve settings that were incompatible with the GE design; (C) failure to provide proper drainage for rod packing; (D) provision of adaptor plates that were poorly designed and which required redesign and replacement; and (E) failure to provide project-specific manuals.

67.    Plaintiff suffered losses between May 2006 and March 2007 of some $19 million due to lost gas injection capacity, by way of reduced day rates paid by Woodside as a result of Plaintiff's inability to deliver the gas compression it had contracted to provide.

68.    Plaintiff has also suffered damages of approximately $2.5 million in connection with efforts to rectify the problems with the compressors summarized above.

69.    Plaintiff is also exposed to damages in the future in the form of reduced day rates payable by Woodside as a result of the compressors' inability to produce the gas compression that Plaintiff's contract with Woodside requires and/or in the form of expenses incurred to provide the contractually required compression capacity by other means.

70.    Neither Bergesen, Bergesen d.y. ASA, Berge Helene Offshore AS nor Plaintiff ever received any disclaimer of warranty or disclaimer of liability from GE.

71.    Neither Bergesen, Bergesen d.y. ASA, Berge Helene Offshore AS nor Plaintiff ever received a copy of either the GE/Flotech contract or the Flotech/Aibel contract.

72.    Neither Bergesen, Bergesen d.y. ASA, Berge Helene Offshore AS nor Plaintiff was aware of any limitations of GE's liability as may have been set forth in the GE/Flotech contract or Flotech/Aibel contract, and the only limitations of liability of which they were aware were those set forth in the contract between Bergesen d.y. ASA and Aibel.

### FIRST CAUSE OF ACTION

### (BREACH OF EXPRESS WARRANTY -TEX. BUS. & COM. ANN. §§ 2.313 AND 2.318)

73.    Paragraphs 1-72 above are repeated and realleged, and incorporated by reference herein.

74.    GE made express oral and written warranties to representatives of Plaintiff and its affiliates that the compressors to be manufactured by GE and installed upon the FPSO BERGE

15

HELENE would conform to certain specifications, and such representations were made with the intent to induce a Bergesen entity to enter into the contract with Aibel.

75.   GE made such express warranties both directly through its own employees and also via its agents, Flotech and Aibel, both of the latter having made such representations with the knowledge, assistance and ratification of GE, that the compressors to be manufactured by GE would conform to stated specifications.

76.   GE also made representations to Plaintiff and its affiliates in the period after the contract was entered into, that the defective compressors could be modified to perform as warranted, but to date it has proven impossible for GE to cause the compressors to perform to the warranted specifications.

77.   The compressors did not meet contractual specifications and cannot deliver the gas compression that they were warranted to provide without suffering major failures resulting in significant down time.

78.   As a result of the failure of compressors to perform as warranted, Plaintiff suffered damages in excess of twenty-one million dollars as described above.

79.   Express warranties were made directly to Plaintiff and/or its affiliates, and Plaintiff is therefore in privity with GE so as to assert express warranty claims against GE pursuant to Tex. Bus. & Com. Ann. § 2.313.

80.   In addition or the alternative, Plaintiff is entitled to assert claims against GE for breach of express warranties even in the absence of privity, pursuant to Tex. Bus. & Com. Ann. §§ 2.313 and 2.318.

16

81.   In addition or in the alternative, Plaintiff was a third party beneficiary of express warranties made by GE to any or all of Aibel, Bergesen, Bergesen d.y. ASA, or Berge Helene Offshore AS, and is entitled on that basis to assert express warranty claims against GE.

82.   In addition or in the alternative, Plaintiff is the assignee under assignments from Bergesen, Bergesen d.y. ASA, and Berge Helene Offshore AS dated September 25, 2008, and is therefore entitled to assert such express warranty claims as those entities would themselves have been entitled to assert against GE pursuant to Tex. Bus. & Com. Ann. §§ 2.313, 2.318 and 2.210.

83.   Neither Plaintiff, Bergesen, Berge Helene Offshore AS nor Bergesen d.y. ASA was ever made aware by GE of any limitation of remedies as between GE and Bergesen d.y. ASA or as between GE and any other party, and even had there been a limitation of liability of which they had been made aware it would be ineffective under Tex. Bus. & Com. §§ 2.719(b) and/or 2.19(c), because such limitations, if any, have failed of their essential purpose and/or are unconscionable.


## SECOND CAUSE OF ACTION

## (BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE -

## TEX. BUS. & COM. ANN. §§ 2.315 AND 2.318)

84.   Paragraphs 1-83 above are repeated and incorporated by reference herein.

85.   GE was aware of the terms and specifications for the compressors required, and knew that the compressors were to be used aboard the BERGE HELENE for the specific purpose of delivering compressed gas at a specified rate.

86.   In contracting for the sale of the compressors, GE provided implied warranties that the compressors to be manufactured by GE were fit for a particular purpose of which GE was aware, and that the compressors would conform to certain identified specifications.

87.   The compressors did not meet the contractual specifications and have never been able to deliver the gas compression that they were warranted to provide without suffering frequent and often severe failures.

88.   The implied warranties flowed directly to Plaintiff, and Plaintiff is therefore in privity with GE so as to assert express warranty claims against GE pursuant to Tex. Bus. & Com. Ann. § 2.315.

89.   In addition or the alternative, Plaintiff is entitled to assert claims against GE for breach of implied warranties even in the absence of privity, pursuant to Tex. Bus. & Com. Ann. §§ 2.315 and 2.318.

90.   In addition or in the alternative, Plaintiff was a third party beneficiary of implied warranties that flowed to any or all of Flotech, Aibel, Bergesen, Bergesen d.y. ASA, or Berge Helene Offshore AS, and is entitled on that basis to assert implied warranty claims against GE.

91.   In addition or in the alternative, Plaintiff is the assignee under assignments from Bergesen, Bergesen d.y. ASA, and Berge Helene Offshore AS dated September 25, 2008, and is therefore entitled such implied warranty claims as those entities themselves would have been entitled to assert against GE. pursuant to Tex. Bus. & Com. Ann. §§ 2.315, 2.318 and 2.210.

92.   Neither Plaintiff, Bergesen, Berge Helene Offshore AS nor Bergesen d.y. ASA was ever made aware by GE of any limitation of remedies as between GE and Bergesen d.y. ASA or as between GE and any other party, and even had there been a limitation of liability of which they had been made aware it would be ineffective under Tex. Bus. & Com. §§ 2.719(b) and/or

18

2.719(c), because such limitations, if any, have failed of their essential purpose and/or are unconscionable.

WHEREFORE, Plaintiff Berge Helene Ltd. respectfully requests that this Court enter judgment in favor of Plaintiff and against the Defendants in an amount to be determined at trial, for all damages suffered by Plaintiff including consequential damages and lost profits, all such interest as may be recoverable by statute or at common law, costs, and such other and further relief as this Court may deem just and proper.

Dated: April 3, 2009

*s/ W. Cameron Beard*
W. Cameron Beard
Attorney in Charge
(admitted *pro hac vice*)
Shawnda M. Grady
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 885-5000
Fax: (212) 885-5001
Email: cbeard@BlankRome.com

John M. Elsley
Royston, Rayzor, Vickery & Williams, L.L.P.
State Bar No.: 06591950
Federal I.D. No. 2828
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile:(713) 225-9945

**Attorneys for Plaintiff Berge Helene Ltd.**

## CERTIFICATE OF SERVICE

We hereby certify that on this 3rd day of April, 2009, a true and correct copy of the above First Amended Complaint Motion was sent via e-mail to Defendant's attorney as follows:

Shawn Bates
Yetter, Warden & Coleman, L.L.P.
909 Fannin, Suite 3600
Houston, Texas 77010

/s/ John M. Elsley
Of Royston, Rayzor, Vickery & Williams, LLP