**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BERGE HELENE LTD., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-02931 |
| | § | |
| GE OIL & GAS, INC., *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

## TABLE OF CONTENTS

I.   BACKGROUND ..................................................................................... 3

II.  STANDARD FOR SUMMARY JUDGMENT ........................................ 4

III. DISCUSSION ........................................................................................ 6

   A.   Choice of Law Analysis ................................................................. 6

     1.   Maritime Subject Matter.......................................................... 6

     2.   Breach of Warranty Under Maritime Law ............................... 8

     3.   State Choice of Law ................................................................ 10

   B.   Merits Analysis ............................................................................. 14

     1.   General Principles on Warranties............................................ 14

     2.   Privity ..................................................................................... 15

     3.   Breach of Implied Warranty of Fitness for a Particular Purpose .................... 19

        a.   GE's Knowledge of Berge's "Particular Purpose" ....................... 19

        b.   Reliance on GE's Skill or Judgment ........................................... 20

        c.   Notice of Breach of Warranty ..................................................... 20

        d.   Plaintiff Suffered Injury .............................................................. 21

        e.   Cause of Plaintiff's Injury ........................................................... 21

     4.   Breach of Express Warranty.................................................... 23

        a.   Elements of the Claim and Legal Standards ................................ 23

        b.   Analysis of GE's Statements........................................................ 26

     5.   Damages .................................................................................. 34

a.    Measure and Types of Breach of Warranty Damages ................................... 34

b.    Types of Damages Claimed by Berge ..................................................................... 36

c.    Proximate Cause Analysis ............................................................................................. 37

d.    Mitigation of Damages ................................................................................................... 39

e.    Offset of Berge's Recoveries from Settlements with Others ........................ 40

C.    Disclaimers of Warranty and Limitations of Damages .......................................... 41

1.    Applicable Legal Principles ................................................................................................. 41

a.    Requirements for Disclaimers and Limitations ............................................ 41

b.    Disclaimers of Implied Warranties – Conspicuousness ............................... 45

c.    Disclaimers of Express Warranties – Reasonableness ................................. 45

d.    Requirements for Damages Limitations .......................................................... 46

2.    Analysis of Disclaimers and Limitations .................................................................... 48

a.    February 2004 Data Sheet ................................................................................... 48

b.    Packager Manual ..................................................................................................... 52

c.    GE-Flotech Agreement and Order Acknowledgement ................................... 54

d.    Contract Chain .......................................................................................................... 57

IV.  CONCLUSION AND ORDER ................................................................................................. 60

## MEMORANDUM AND ORDER

This case is before the Court on three Motions for Summary Judgment ("Motions")[1] filed by Defendants GE Oil & Gas, Inc., *et al*. ("GE"), to which Plaintiff Berge Helene Ltd. ("Berge") has filed a Response [Doc. # 196].  Defendants have filed a Reply [Doc. # 202], and Plaintiff has filed a Sur-Reply [Doc. # 208].  Having considered the full record in this case, the parties' arguments, and governing legal authorities, the Court **grants in small part** and **denies in part** Defendants' Motions.

---

[1]    Defendant GE's Motion for Summary Judgment on Plaintiff's Implied Warranty Claims ("MSJ Implied") [Doc. #179]; Defendant GE's Motion for Summary Judgment on Plaintiff's Express Warranty Claims ("MSJ Express") [Doc. # 180]; Defendant GE's Motion for Summary Judgment on Plaintiff's DamagesClaims ("MSJ Damages") [Doc. # 181].

I.     <u>BACKGROUND</u>

Plaintiff Berge is the owner of a Floating Production, Storage and Offloading unit ("FPSO") used in the storage and production of petroleum products.  Defendant GE is a company that *inter alia* manufactures gas compressors.  In February 2004, Berge met with representatives from GE, Flotech Limited ("Flotech"), and ABB Offshore Systems AS ("Aibel") in Oslo, Norway so that the latter three companies could present the use of GE compressors as part of a "compressor solution" aboard the FPSO *Berge Helene.* During the meeting, Berge received a compact disk titled "Software and Technical Data: GE Oil & Gas High Speed Reciprocating Gas Compressor."  Shortly after the Oslo meeting, Berge received a packet of informational and promotional materials ("Packet") about the "compressor solution."  These materials—which featured GE, Aibel, and Flotech's logos—included a February 9, 2004 technical data sheet ("February 2004 Data Sheet") and a three-page promotional flyer called "GE Oil & Gas Compressor News" ("Flyer").

Subsequently, on May 29, 2004, Berge contracted with third party Woodside Mauritania Pty Ltd. ("Woodside"), to provide the services of Berge's FPSO and to provide 70 mmscfd of gas compression in the Chinguetti oil field off the coast of Mauritania.  GE Ex. 1 at BER000016 ("Berge-Woodside Agreement").  In order to meet these compression requirements, Berge entered into a contract with ABB Offshore Systems AS ("Aibel"), dated June 24, 2004, for the purchase and installation of three compressors on the FPSO.  GE Ex. 5 at BER005880 ("Aibel-Berge Agreement").  Berge and Aibel also had a pre-existing contract from August 14, 2001 by which Berge selected Aibel to manage, operate, and maintain the FPSO.  GE Ex. 4 at BER139588 ("Aibel-Berge Operations Agreement").  By contract dated November 2003, Aibel agreed with Flotech Limited ("Flotech") to purchase GE compressors packaged by Flotech.  GE Ex. 6 at GEOG 152059 ("Flotech-Aibel Agreement").[2]  Flotech had a pre-existing Packager Agreement with GE, dated December 2002, that provided that Flotech would package

---

[2]     Here, "to package" refers to the design and installation of piping and other ancillary equipment for the compressors.  See Berge Ex. 2 at BER000642, ABB, Flotech and GE Presentation of Gas Solution to Berge.

compressors manufactured by GE.  GE Ex. 16 at GEOG005857 ("GE-Flotech Agreement").[3]

Berge contends that shortly after the compressors were placed into production on the FPSO, they experienced significant and ongoing failures that resulted in Berge being unable to provide the contractually required rate of gas compression.  Accordingly, on October 1, 2008, Berge sued GE in this Court alleging breach of express warranties and breach of implied warranties of fitness.[4]  On June 14, 2011, after the parties engaged in extensive discovery, GE filed the instant Motions, which have been fully briefed and are now ripe for decision.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The moving party bears the burden of demonstrating that there is no evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008).  If the moving party meets this initial burden, the burden shifts to the nonmovant to set forth specific facts showing the existence of a genuine issue for trial.  *See Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Hines v. Henson*, 293 Fed. App'x 261, 262 (5th Cir. 2008) (citing *Pegram v. Honeywell*, Inc., 361 F.3d 272, 278 (5th Cir. 2004)).

In deciding whether a genuine and material fact issue has been created, the Court construes all facts and considers all evidence in the light most favorable to the

---

[3]    The record suggests that GE and Flotech had worked together before the Chinguetti project.  *See* Berge Ex. 11 (email from Flotech CEO Stephen Broadbent suggesting that the "GE-ABBOS-Flotech team should undertake a formal de-brief the Addax project." Addax was a previous project in which Berge selected competitors to provide compression rather than Aibel and Flotech).

[4]    *See* Compl. [Doc. # 1].

nonmoving party. *Nat'l Union Fire Ins.*, 532 F.3d at 401; *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  There must be "a showing of more than a mere "scintilla" of evidence.  *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (citing *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994)).  The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002), *overruled on other grounds*, *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the nonmovant's burden.  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."  *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In a case to be tried to the Court without a jury, "a district court has somewhat greater discretion to consider what weight it will accord the evidence" on summary judgment.  *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010) (quoting *In re Placid Oil Co.,* 932 F.2d 394, 397 (5th Cir. 1991)).  "When deciding a motion for summary judgment prior to a bench trial, the district court 'has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result.'"  *Id.* (quoting *In re Placid Oil*, 932 F.2d at 398).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court.  *Malacara v. Garber*, 353 F.3d 393,

405 (5th Cir. 2003).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *See id.* (internal citations and quotations omitted).

## III.   DISCUSSION

### A.   Choice of Law Analysis

#### 1.   Maritime Subject Matter

To decide the merits of GE's motions, the Court first must decide which body of law to apply in evaluating Berge's warranty claims.  Since warranty claims arise out of contract, the Court must determine whether the contract or contract-related interactions fall under the Court's maritime jurisdiction requiring application of maritime contract law.  Concluding that maritime contract law applies, the Court holds that there is no relevant federal common law and undertakes state choice of law analysis to determine which state's substantive law applies.  The Court concludes that Texas is the state with the greatest interest in the issues at hand and its law applies to this dispute.

To ascertain the extent of admiralty jurisdiction over contracts and claims arising from contract, courts look first to the nature or subject matter of the contract.  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23-24 (2004) (citations omitted).  "Determination of the nature of a contract depends in part on historical treatment in the jurisprudence and in part on fact-specific inquiry."  *Devon La. Corp v. Petra Consultants, Inc.*, 247 F. App'x, 539, 543-44, 54 (5th Cir. 2007) (citing *Davis & Sons, Inc. v. Gulf Oil Corp*, 919 F.2d 313, 316 (5th Cir. 1990)).  Contracts for repair, alteration, conversion, or reconstruction of a vessel which, previous to such work, was actively engaged in maritime commerce or navigation generally are considered maritime contracts.  *N. Pac. Steamship Co. v. Hall Bros. Marine R.R. & Shipping Co.*, 249 U.S. 119, 128 (1918) (applying admiralty jurisdiction in an action to recover compensation for repairs to the hull of a vessel, whether repairs were made while the vessel was afloat, while in dry dock, or while "hauled up by ways upon land"); *The Robert W. Parsons*, 191 U.S. 17, 33, 34 (1903) (holding that contracts for repairs to a vessel are maritime even though made in dry dock); *Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 622-623 (5th Cir. 1955)

6

(work performed on vessel whose superstructure, deck and cabins were intact, which was afloat and capable of being used as means of water transportation, even though it had no power to move or mechanism to steer, constitutes repair work on vessel subject to maritime lien).

On the other hand, contracts for the building of a ship, or supplying materials for her construction, are not maritime in nature. *People's Ferry Co. v. Beers,* 61 U.S. 393, 401 (1857) ("Admiralty jurisdiction, in cases of contract, depends primarily upon the nature of the contract, and is limited to contracts, claims, and services, purely maritime, and touching rights and duties appertaining to commerce and navigation."); *Thames Towboat Co. v. The Schooner "Francis McDonald,"* 254 U.S. 242, 244-45 (1920) (holding that services and materials furnished to an already launched but uncompleted hull did not give rise to a claim in admiralty); *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1185 (5th Cir. 1984). Contracts for the supply of goods or services in connection with the construction of a vessel are not entitled to claim in admiralty. *See, e.g.*, *Thames Towboat*, 254 U.S. at 243.

Significant to the instant dispute, warranty claims arising from a construction contract or the supply of materials for the construction of a new vessel are not maritime in nature. In *East. River Steamship Corp. v. Transamerica Delaval Inc*., the Supreme Court noted that claims brought as breach-of-warranty actions would not be within the admiralty jurisdiction. "Since contracts relating to the construction of or supply of materials to a ship are not within the admiralty jurisdiction . . . [,] neither are warranty claims grounded in such contracts. State law would govern the actions. In particular the Uniform Commercial Code, which has been adopted by 49 states, would apply." 476 U.S. 858, 872 n.7 (1985) (citing *Thames Towboat*, 254 U.S. at 243).

The nature of the contracts and the interactions among Woodside, Berge, Aibel, Flotech, and/or GE all pertain to maritime activities. First, prior to any alteration of the *Berge Helene* to perform Berge's contract with Woodside, the *Berge Helene* existed as an FPSO, which is classified as a "vessel."[5] *See* Complaint ¶ 10. Second, the purpose of the

---

[5]     A vessel is "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation by water." 1 U.S.C. § 3 (2006). The Fifth

7

parties' agreements was to alter the *Berge Helene* to make it capable of processing and storing oil offshore.[6]   The work ordered by Berge on the *Berge Helene*, *i.e.*, the production and installation of topside modules with GE's compressors, constituted alteration of an existing vessel.  *See N. Pac. Steamship Co. v. Hall Bros. Marine R.R. & Shipping Co.*, 249 U.S. 119, 128 (1918).  Third, generally, contracts relating to offshore oil-and-gas production and storage aboard a vessel are maritime in nature.  *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-39 (5th Cir. 1986) (citations omitted) ("Oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce"); *see also Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 954 (5th Cir. 1988) ("The development of offshore oil production has necessitated an expansion of maritime law generally and the definition of a maritime contract specifically."); *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332 (5th Cir. 1981); *Pippen v. Shell Oil Co.*, 661 F.2d 378, 384 n.9 (5th Cir. 1981).  Accordingly, maritime law applies to Berge's express and implied warranty claims.

### 2.      Breach of Warranty Under Maritime Law

Defendant argues that the Supreme Court's decision in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), controls the instant case because the opinion establishes clear rules for breach of warranty claims under maritime law.  This Court disagrees.  In *East River Steamship*, the Supreme Court focused on the availability of negligence and product liability claims under maritime law where the only loss was economic.  *Id.* at 871.  The Court in *East River Steamship* held that, under

---

Circuit has held a variety of structures used in the oil and gas exploration and production to be "vessels."  *See, e.g.*, *Offshore v. Robinson*, 266 F.2d 769 (5th Cir. 1959) (holding that a mobile drilling platform or barge attached to the ocean floor by retractable legs is a vessel because it can be towed from place to place).

GE also notes that the FPSO was mobile at time of the contracts and delivery of compressors and that the FPSO's engines remained intact.  MSJ Implied at 15.

[6]      Woodside needed a FPSO to produce and store petroleum products offshore.  Berge bid and offered to "acquire, convert, and operate a FPSO."  MSJ Implied at 3.  Because of the requirements of oil production on the Chinguetti project, Berge required topside modules to be installed on the vessel's deck.  *Id.*

admiralty law, a manufacturer in a commercial relationship has no duty, under either a negligence or strict products liability theory, to prevent a product from breaking down or damaging itself. *Id.* Although the Court (in passing) explained in *dicta* why warranty law is suited for resolving disputes in which the defective product damages only itself, the Court did not articulate rules on breach of warranty claims under maritime law.[7] Indeed, the Court did not establish maritime rules governing key issues in warranty cases, such as rules on privity, reliance, disclaimers, or consequential damages, issues central to this case.

In addition, in *East River Steamship,* the allegedly defective items, turbines, were designed, manufactured, and installed during the course of the ship's original construction. *See id.* at 859-60. As noted, contracts for the construction of a ship, or supplying materials in the course thereof, are not maritime in nature. *People's Ferry Co.,* 61 U.S. at 401; *Thames Towboat Co.*, 254 U.S. at 244-45; *Lowe v. Ingalls Shipbuilding*, 723 F.2d at 1185.[8] At bar, in contrast, the GE compressors were installed on an existing vessel. The agreements and the interactions among the parties are maritime in nature. *East River Steamship* is not dispositive regarding the choice of law or breach of warranty claims at issue.

The Court must also ascertain the maritime rules of law for warranty claims arising from contracts to alter or refit a vessel. Where no maritime rule of law exists, courts apply state contract law to maritime contract disputes to the extent that the state law is not inconsistent with admiralty principles. *See Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 (5th Cir. 1995) (noting that "admiralty principles govern

---

[7]     The Supreme Court only made general observations about expectation damages being available and contractual privity "still [being] generally enforced" in warranty actions where losses are purely economic. *Id.* at 873-874.

[8]     The Supreme Court actually noted that had the parties brought breach-of-warranty actions rather than tort actions, the breach-of-warranty actions "would not be within the admiralty jurisdiction" because "contracts relating to the construction of or supply of materials to a ship are not within the admiralty jurisdiction." *Id.* at 872 n.7. The Court had admiralty jurisdiction in *East River Steamship* because "the torts alleged . . . clearly fall within the admiralty jurisdiction" and "satisfy the traditional 'locality' requirement—that the wrong must have occurred on the high seas or navigable waters." 476 U.S. at 863-64.

contracts for vessel repair and conversion" and that "to the extent that it is not inconsistent with admiralty principles . . . state contract law may be applicable to maritime contracts") (citing *Todd Shipyards Corp. v. Turbine Serv. Inc.*, 674 F.2d 401, 412 (5th Cir. 1982); *Koninklyke Nederlandsche Stoomboot Maalschappy, N.V. v. Strachan Shipping Co.*, 301 F.2d 741, 743 (5th Cir. 1962)). Courts rely on the Uniform Commercial Code ("U.C.C.") as a reliable source for federal admiralty law. *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 189 (5th Cir.), *cert. denied*, 469 U.S. 1037 (1984)); *see also Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 832 (4th Cir. 1998) (stating that "U.C.C. principles inform admiralty law"); *Southworth Machinery Co. v. F/V Corey Pride*, 994 F.2d 37, 41 n.3 (1st Cir. 1993) (citing *Interpool Ltd. v. Char Yigh Marine, S.A.*, 890 F.2d 1453, 1459 (9th Cir. 1989), *amended*, 918 F.2d 1476 (9th Cir. 1990) ("In maritime commercial transactions, the Uniform Commercial Code is taken as indicative of the federal common law of admiralty.")) (applying the U.C.C. to a maritime contract involving the sale and installation of a rebuilt engine for use on an existing commercial vessel). Accordingly, this Court turns to the U.C.C. to determine applicable rules of law on Berge's breach of warranty claims.[9]

### 3.    State Choice of Law

The Court must decide which state's version of the U.C.C. governs this maritime warranty case. A federal court sitting in admiralty must apply general federal maritime choice of law rules. *Albany Ins. Co. v. Kieu*, 927 F.2d 882, 890 (5th Cir. 1991), *cert. denied*, 502 U.S. 901 (1991) (citing *Gonzalez v. Naviera Neptuno* A.A., 832 F.2d 876,

---

[9]     The Court rejects GE's argument that Article 2 of the "general" or non-state specific U.C.C., rather than a specific state's version of the U.C.C., applies as the governing maritime law. GE's proffered approach is unworkable and is unsupported by any dispositive legal authority. The opinion in *Clem Perrin*, 730 F.2d at 188-89 does not support GE's position. In *Clem Perrin*, the Fifth Circuit cited one maritime case that applied a *state*'s adopted version of the U.C.C. in support of the proposition that the U.C.C. is a source for admiralty law. *See id.* at 189 (citing *Jones v. One Fifty Foot Gulfstar*, 625 F.2d 44 (5th Cir. 1980) (applying Florida's U.C.C.)). The Fifth Circuit's citations to *United States v. Conrad Pub. Co.,* 589 F.2d 949, 953 (8th Cir. 1978) and *United States v. Hext*, 444 F.2d 804, 809 (5th Cir. 1971), are also inapposite. In *Conrad Publishing*, the Eighth Circuit applied North Dakota's adopted version of the U.C.C. 589 F.2d at 953. *Hext*, which appeared to apply provisions of the general U.C.C., was not a maritime case and is too slim a reed to support GE's contention. 444 F.2d at 809.

880 n. 3 (5th Cir. 1987)); *see also Chan v. Society Expeditions, Inc.*, 123 F.3d 1287 (9th Cir. 1997) ("In the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 571 (1953).").

Maritime choice of law analysis is substantially similar to the "most significant relationship" test set forth in sections 6 and 188 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS ("RESTATEMENT") that Texas courts apply to resolve choice of law issues. *See Gabarick v. Laurin Maritime (Amer.) Inc.*, 650 F. 3d 545, 553 (5th Cir. 2011) (citing *Kieu*, 927 F.2d at 886); *Kieu*, 927 F.2d at 891 (applying RESTATEMENT §§ 6, 188 analysis to maritime insurance case);[10] *Jones v. Francis Drilling Fluids, Ltd.*, 2008 WL 5158268, at *5 (S.D. Tex. Dec. 9, 2008) (citations omitted) ("Texas courts apply the 'most significant relationship' test set out in [the RESTATEMENT] . . . Maritime law requires a substantially similar test").[11]

Under the RESTATEMENT, courts must consider the types of contacts that a state has with the transaction and the parties in order to determine the applicable law. These types of contacts include:

(1)     the place of contracting,

(2)     the place of negotiation of the contract,

---

[10]     In *Kieu*, the Fifth Circuit characterized the RESTATEMENT "most significant relationship test" as involving two steps. First, the court advised to look to where the contract was formed, issued, and delivered in order to "[identify] the states which have sufficient contact with the policy and the parties [such] that their laws *can* be applied." *Id*. at 891 (citing *Truehart v. Blandon*, 884 F.2d 223, 226 (5th Cir. 1989)). Second, the court must determine which among the identified states has the greatest interest in the resolution of the issues presented. *Id.* The Fifth Circuit emphasized that "the application of the most significant relationship approach does not simply turn on the number of contacts each state has with the controversy." *Id.* (citing RESTATEMENT § 6). Instead, "the most significant relationship approach examines the relative interests of all of the states which share a sufficient relationship with the transaction and parties." *Id.*

[11]     *See Jones*, 2008 WL 5158268, at *5 n.2 (Rosenthal, J.) (applying the *Kieu* approach to the RESTATEMENT analysis in a maritime jurisdiction case by characterizing the RESTATEMENT as dictating essentially a two-step process: first there must be a determination of which states have material contacts with the policy and the parties, and then which of those states has the greatest interest in resolving the issues presented).

11

(3)     the place of performance,

(4)     the location of the subject matter of the contract, and

(5)     the domicile, residence, nationality, place of incorporation and place of business of the parties.

RESTATEMENT § 188(2) (1971).

Berge's implied warranty claims stem from GE's knowledge of Berge's intended purposes for the GE compressors, not from any formal written or oral contracts between those parties.  Berge's express warranty claims emanate, not from a formal contract between GE and itself, but rather from express representations that GE allegedly made directly to Berge.  In the absence of a formal agreement between the litigating parties, this Court must apply the RESTATEMENT test flexibly, focusing on the parties' interactions and whatever contacts existed.  *See* RESTATEMENT § 188(2) ("[T]hese contacts are to be evaluated according to their relative importance with respect to the particular issue."); *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 680-81 (Tex. 2004) (breach of express warranty class action in which the court identified section 188 as the source of choice of law analysis); *see also Kieu*, 927 F.2d at 891; *Johansen v. E.I. Du Pont De Nemours & Co.*, 810 F.2d 1377, 1381 (5th Cir. 1987) (citations omitted) (noting that on remand, district court must determine what jurisdiction's law will govern implied and express warranty claims under RESTATEMENT's choice-of-law analysis).

Here, the parties do not discuss the location(s) where potentially pertinent agreements were signed, negotiated, or delivered.  The parties also do not argue the application of any particular body of law other than, generally, federal maritime law or Texas state law.  The evidence before the Court demonstrates that Texas is the only state within the United States that had connections with the transactions and the parties to support application of its warranty laws.[12]  GE's principal place of business is in Houston, Texas.[13]  A material part of the design team for the compressors was based in Texas.[14]

---

[12]     The parties do not argue that the law of a foreign country should apply.

[13]     Compl. ¶ 5; Answer ¶ 5 [Doc. # 11].

Berge complains about express warranties allegedly made by GE's Houston-based representatives, such as GE Sales and Marketing Manager Coleman de Jong ("de Jong"), at the February 2004 meeting at Berge's offices in Oslo.[15]   GE also contends that at this meeting, its representatives provided Berge with GE's "Packager Policies and Procedural Manual" (the "Packager Manual") compact disk, limiting GE's warranties and liabilities.[16]   In addition, Houston representatives produced or assisted in the production of promotional materials (the "Packet"),[17] including a pertinent one-page "EZ-Size Data Sheet" dated February 9, 2004 (the February 2004 Data Sheet)[18] that was forwarded to Berge shortly after the February 2004 Oslo meeting.  The parties debate numerous issues about this Data Sheet, but the record makes clear that it has meaningful connection to Houston.  GE's Houston office was allegedly responsible for the "EZ-Size Software" used to create the February 2004 Data Sheet and the allegedly improper gas rod load and

---

[14]   Resp. at 2 (citing Berge Ex. 6 at GEOG 248138, GEOG248141 (SHMB design file noting "GE Site" as Corpus Christi, and listing Texas-based Gemini and Italy-based Nuovo Pignone design team members)).

[15]   *See* Resp. at 4-5; Berge Ex. 84, de Jong Depo. at 38 (discussing his statements at the February 2004 Oslo meeting); Berge Ex. 98, Svendsen Depo. at 50.

[16]   Berge also asserts that GE supplied at this meeting a list of "contact people" including representatives from the Houston office.  Compl. ¶ 20 (noting that the compact disk that GE provided to Berge contained a list of GE sales contacts, all of which were employed in GE's Houston offices).

[17]   MSJ Express at 4 (citing GE Ex. 11 at BER000638); Resp. at 4 (citing Berge Ex. 2 at BER000681-83).  The Packet and Flyer on GE's pertinent technology featured GE's logo with Houston contact information, as well as the Houston contact information for three GE representatives, including de Jong.  *See* Berge Ex. 2 at BER000681-BER000683.  According to GE, it was Aibel that forwarded these materials to Berge after the meeting.  MSJ Express at 4.

[18]   The February 2004 Data Sheet and other versions of this document are each  a single page prepared using GE's "EZ Size" program and, according to Berge, contained GE's assumptions about gas rod load calculations.  Resp. at 11 (alleging that Flotech CEO Stephen Broadbent "prepared or caused to be prepared by Flotech employees various EZ-Size data sheets"); *see also* MSJ Express at 4.  The evidence establishes that packagers and purchasers use such data sheets to determine the suitability of a compressor for a job by comparing the estimated gas loads on the data sheet to the maximum rod load in another place on the data sheet.

other figures used in it.[19]  GE relies on language on the February 2004 Data Sheet as a key "disclaimer" in defense of Berge's claims in this case.  Thus, within the United States, Texas is the state with the greatest interest in the warranty claims in this case.  *See U.S. Tire-Tech, Inc. v. Custom Blending Int'l, Inc.*, 110 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *see also Kieu*, 927 F.2d at 891 (maritime choice of law analysis ultimately turns on which state has the "greatest interest in the resolution of the issues.").  Accordingly, maritime choice of law analysis dictates application of Texas law.

## B.   Merits Analysis

Having concluded that Texas's version of the U.C.C. applies to this case as maritime breach of warranty law, the Court now analyzes Texas warranty law on the merits of GE and Berge's arguments.

### 1.   General Principles on Warranties

An implied warranty is a representation about the implied quality or suitability of a product that the law implies and imports into a contract, "in view of all facts and circumstances attending the transaction, including the nature of the property, terms of the agreement, and trade usages."  *Amer. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 435 (Tex. 1997) (citing *Donelson v. Fairmont Foods Co.,* 252 S.W.2d 796, 799 (Tex. Civ. App.—Waco 1952, writ ref. n.r.e.)); *LaBella v. Charlie Thomas, Inc.*, 942 S.W.2d 127, 131 (Tex. App.—Amarillo 1997, pet. den.); *see also* U.C.C. § 2-315 (2011) ("Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select

---

[19]    *See* Resp. at 2 (noting that GE in Texas used EZ-Size software to size or select compressors for individual clients); *id.* at 11 (citing Berge Ex. 100, McDonald Depo. at 115; Berge Ex. 107, Pratesi Depo. of May 8, 2011 at 30-31; Berge Ex. 108 Sarshar Depo. of May 23, 2011 at 35-36, 71-81; Berge Ex. 110, Gajjar Depo. at 78-84) (alleging that GE set the "gas rod load" or "frame load" for the compressor improperly).   The Houston office had made calculations using EZ-Size software.  Resp. at 14 (citing Berge Ex. 31; Berge Ex. 32).  Finally, according to Berge, GE's Texas salesmen were involved because they asked GE's Italian Nuovo Pignone division to check the load calculations using "calc 26," the software that Nuovo Pignone used.  *See id.*

or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.").  Where an implied warranty is established, it can only be excluded or modified pursuant to section 2.316(b) of the Texas Business and Commerce Code, which requires that any such exclusion or modification be in writing and be conspicuous.  *See Cate v. Dover Corp.*, 790 S.W.2d 559, 560-61 (Tex. 1990); *Womco, Inc. v. Navistar Int'l Corp.*, 84 S.W.3d 272, 279-80 (Tex. App.—Tyler 2002, no pet.).

An express warranty is created when any affirmation of fact or promise is made by a seller to a buyer that relates to the goods or services sold and becomes part of the basis for the bargain.  TEX. BUS. & COM. CODE § 2.313; *Lyda Constructors, Inc. v. Butler Mfg. Co.*, 103 S.W.3d 632, 637 (Tex. App—San Antonio 2003, no pet.); *Rinehart v. Sonitrol of Dallas, Inc*., 620 S.W.2d 660, 662-63 (Tex. Civ. App.—Dallas 1981, ref. n.r.e.). Where an express warranty is established, it can only be excluded or modified pursuant to Section 2.316(a) of the Texas Business and Commerce Code, which requires that exclusions and modifications be "reasonable" as consistent" with the express warranties made.

### 2.    Privity

Both parties focus their arguments on whether contractual privity between Berge and GE is required for Berge to bring claims for breaches of express warranty and implied warranty of fitness for a particular purpose against GE.  There is no dispute that GE and Berge are in vertical privity with each other for purposes of the warranty claims in issue.  Berge was within the direct chain of distribution although it did not purchase the compressors from GE directly.[20]

---

[20]    *See* Reply at 9 n.4.  Texas courts recognize two kinds of privity—vertical and horizontal. *See Garcia v. Tex. Instruments, Inc.*, 610 S.W.2d 456, 463-64 (Tex.1980)  "Vertical privity" in breach of warranty claims includes all parties in the distribution chain from the initial supplier of the final product to the ultimate purchaser.  *Id.*  "Horizontal privity" includes any person who uses or is affected by the product, including any non-purchasing party outside of the distribution chain from the original supplier.  *Id.*; *see also Keith v. Stoelting, Inc.*, 915 F.2d 996, 999 (5th Cir. 1990) ("Vertical" privity includes parties up the distributive chain from the immediate seller);

*Implied Warranty Claims.*— Article 2 of the Texas version of the U.C.C. does not address the privity requirement in implied warranty actions:

> This chapter does not provide whether anyone other than a buyer may take advantage of an express or implied warranty of quality made to the buyer or whether the buyer or anyone entitled to take advantage of a warranty made to the buyer may sue a third party other than the immediate seller for deficiencies in the quality of the goods.  These matters are left to the courts for their determination.

*See* TEX. BUS. & COM. CODE § 2.318.  The Texas Supreme Court in *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 81 (Tex. 1977), established the governing rule: Privity of contract is not required for an Article 2 implied warranty cause of action for economic loss.  In *Nobility Homes*, a buyer brought a warranty action against a mobile home manufacturer to recover for economic loss when the buyer's contract was only with an independent retailer, not the manufacturer.  *Id.* at 77.  The Texas Supreme Court reasoned that "to hold otherwise, would encourage manufacturers to use thinly capitalized 'collapsible corporations' to sell their commercially inferior products leaving no one for the buyer to sue for his economic loss."  *Id.* at 81-82.  Thus, the Texas Supreme Court permitted the *Nobility Homes* consumer plaintiff to bring an implied warranty claim against a mobile home manufacturer, even though the plaintiff had not purchased his mobile home directly from that company.  Accordingly, contractual privity is not required under Texas law as imported into maritime law for purposes of this case.

*Express Warranty.*— Article 2 of the Texas U.C.C. does not address privity in regard to express warranty claims.  TEX. BUS. & COM. CODE § 2.318.  For such claims, the Texas Supreme Court has not decided whether privity is required in order to recover purely economic losses and the Texas courts of appeals are divided on the issue.  *See Nobility Homes*, 557 S.W.2d 77, 79 (Tex. 1977); *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107-09 (Tex. App.—Houston [14th Dist.] 2003).  In the 1970s, several Texas courts held that privity of contract was required in cases involving purely

---

*Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107-09 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citations omitted); 1 WHITE & SUMMERS, *supra*, § 11-5.

economic losses arising from express warranties. *Tex. Processed Plastics, Inc. v. Gray Enter., Inc.*, 592 S.W.2d 412, 415 (Tex. Civ. App.—Tyler 1979, no writ) ("[I]n situations involving solely economic loss based upon breach of express warranty, privity of contract between the parties is required."); *Henderson v. Ford Motor Co.*, 547 S.W.2d 663, 667 (Tex. Civ. App.—Amarillo 1977, no writ.); *Pioneer Hi-Bred Int'l, Inc. v. Talley*, 493 S.W.2d 602, 607-08 (Tex. Civ. App.—Amarillo 1973, no writ); *Eli Lilly & Co. v. Casey*, 472 S.W.2d 598, 600 (Tex. Civ. App.—Eastland 1971, writ dism'd).  As noted by the Texas Supreme Court in 2004, however, the more recent trend among the courts of appeals is not to require privity of contract for express warranty claims generally.  *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd.*, 146 S.W.3d 79, 88 (Tex. 2004) ("While it appears we have never addressed the [privity] issue regarding express warranties, several lower courts have applied the same [*Nobility*] rule in that context—express warranties pass with goods"); *see U.S. Tire-Tech, Inc. v. Borean, B.V.*, 110 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (holding that privity of contract is not required in order to sustain a breach of express warranty claim for purely economic losses where express warranty was created through representations from third party to second party and passed on to the plaintiff); *Edwards v. Schuh*, 5 S.W.3d 829, 833 (Tex. App.—Austin 1999, no pet.) ("Privity is not required to enforce an express warranty under the DTPA."); *Church & Dwight Co. v. Huey*, 961 S.W.2d 560, 568 (Tex. App.—San Antonio 1997, pet. denied) ("No privity is required for [express] warranty under the DPTA"); *Nat'l Bugmobiles, Inc. v. Jobi Prop.*, 773 S.W.2d 616, 622 (Tex. App.—Corpus Christi 1989, writ denied) ("Privity of contract is . . . not necessarily required in order to establish a breach of an express warranty."); *Indus-Ri-Chem Laboratory, Inc. v. Par-Pak Co.,* 602 S.W.2d 282, 287 (Tex. Civ. App.—Dallas 1980, no writ) ("privity of contract is not required where the manufacturer furnishes samples to a middleman with the knowledge that these samples are likely to be submitted to the ultimate buyer so as to induce a sale of the product.").  Further, the 1970s cases are factually distinguishable from the circumstances at bar.  In those earlier cases, there were no clear direct

communications between the ultimate buyer and the manufacturer.  *See Tex. Processed Plastics, Inc.*, 592 S.W.2d at 415 (horizontal privity case where first buyer "had nothing to do with the sample that was sent to [ultimate buyer]," "made no guarantee to [ultimate buyer]," and "did not in any way deal with [ultimate buyer] in the sale"); *Henderson*, 547 S.W.2d 663, 665-67 (no indication of direct contacts between consumer plaintiff and manufacturer defendant Ford Motor Company); *Pioneer Hi-Bred Int'l*, 493 S.W.2d at 608 (plaintiff "had neither seen, read nor relied upon any advertising or brochures published by [manufacturer defendant]" and "obtained his total information regarding the seed through representations made by the local retailer"); *Eli Lilly*, 472 S.W.2d at 599 (defendant manufacturer "does not and has not at any time sold Treflan to the general public"; it sold product through independent retail outlets).  The Court endorses the reasoning of the recent Texas appellate cases and holds that no privity is necessary for an express warranty claim that arises from communications by an identifiable person (the defendant in suit) to the ultimate buyer (the plaintiff).[21]  Berge has produced substantial uncontradicted evidence that it had direct communications with GE about the compressors in issue.  Thus, no privity between Berge and GE is required for Berge to assert a breach of express warranty claim against GE in this case.[22]

---

[21]     The Court does not adopt Berge's proffered extension of this principle.  Berge argues that GE's direct communications to Plaintiff, orally and in writing, constitute a new type of privity, "direct privity."  Resp. at 40 (citing *US LED, Ltd. V. Nu Power Assoc.,* 2008 U.S. Dist. LEXIS 71663, at *20 (S.D. Tex. Sept. 22, 2008); *Enpro Sys., Ltd. v. Namasco Corp.*, 382 F. Supp. 2d 874, 888 (S.D. Tex. 2005); *Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 558 (S.D. Tex. 1997)); Sur-Reply at 7-8 (citing *e.g., Point Blank Solutions v. Toyobo Amer. Inc.*, 2010 U.S. Dist. LEXIS 117447, at *9-*10 (S.D. Fla. Nov. 3, 2010)).  Although Texas courts have held that direct interactions between a manufacturer and remote purchaser can be the basis for express warranty claims, these courts have not held that such interactions constituted "direct privity."  *See* citations *supra*.

[22]     The Court does not reach Berge's argument that Flotech and/or Aibel had apparent authority to create express warranties enforceable against GE with respect to GE's role in the design of the entire compressor package.  Resp. at 43.  The GE-Flotech agreement explicitly states: "Packager [Flotech] is not the agent of the Manufacturer [GE] and has no right or authority to assume or create any obligation of any kind, express or implied, on behalf of the Manufacturer, or to bind Manufacturer in any respect whatsoever."  GE Ex. 16 at GEOG005847. Plaintiff has failed to cite evidence indicating that Aibel had an agency relationship with GE.

### 3. Breach of Implied Warranty of Fitness for a Particular Purpose

Having established that contractual privity between Berge and GE is not required, the Court analyzes the remaining elements for Berge's implied warranty claims, which are:

(1)   at the time the contract for sale was made, the seller knew or should have known of the particular purpose for which the goods would be used and that the plaintiff was relying on the defendant's skill or judgment to select or furnish suitable goods;

(2)   the plaintiff actually relied on the defendant's skill or judgment;

(3)   the plaintiff notified the defendant of the breach;

(4)   the plaintiff suffered injury; and

(5)   the defendant's breach caused the plaintiff's injury.

*See* TEX. BUS. & COM. CODE § 2.315.

### a. GE's Knowledge of Berge's "Particular Purpose"

A plaintiff must establish that the defendant knew or should have known of a "particular purpose" for the goods or services at the time of the sale. TEX. BUS. & COM. CODE § 2.315. A "particular purpose" is a specific use by the buyer that is peculiar to the nature of the buyer's business. A particular purpose differs from an ordinary purpose, which is the purpose envisaged in the concept of merchantability and goes to the uses that are customarily made of the goods. *Id.* § 2.315 cmt. 2; *ASAI v. Vanco Insulation Abatement, Inc.*, 932 S.W.2d 118, 112 (Tex. App.—El Paso 1996) (citing *Crosbyton Seed Co. v. Mechura Farms*, 875 S.W.2d 353, 365 (Tex. App.—Corpus Christi 1994) (citations omitted)). Here, the evidence plainly establishes that GE knew its compressors were being installed as part of topside modules on the *Berge Helene* and that the compressor modules were to process and store oil from the Chinguetti field.[23]

---

[23]   In January 2004, for example, GE representatives from Houston met with Flotech in Florence, Italy, to discuss the sale of GE compressors to Berge for use in the Chinguetti project. Resp. at 3 (citing Berge Ex. 88, Broadbent Depo. of Sept, 22, 2010, at 39-43). At the February 2004 meeting in Oslo, Norway, GE representatives also emphasized the suitability of the SHMB-604 model for use on a FPSO. Resp. at 3 (citing Berge Ex. 84, De Jong Depo. at 38; Berge Ex. 98, Svendsen Depo. at 50).

The February 2004 Data Sheet and GE's Flyer provided to Berge also suggest that GE was aware of the levels of gas rod load and rotational speed that Berge sought.   GE does not argue to the contrary.[24]

### b.   Reliance on GE's Skill or Judgment

Next, a plaintiff pursuing an implied warranty of fitness for a particular purpose must establish that it relied on the defendant's skill or judgment to select or furnish the suitable goods.  TEX. BUS. & COM. CODE § 2.315.  Generally, there must be justifiable reliance by the buyer on the seller's representation.  *Brown v. Asgrow Seed Co. of Tex.*, 379 S.W.2d 412, 414 (Tex. Civ. App.—San Antonio 1964, reh'g denied) (citing *McMorries v. Clardy*, 232 S.W.2d 167, 169 (Tex. Civ. App.—El Paso 1950, reh'g denied)).  Berge has established that it was concerned about whether the compressor design was "balanced" and how much vibration it would produce.  For example, Berge has presented testimony of its hull engineer that at the February 2004 Oslo meeting he inquired into how GE would keep vibrations out of the hull and GE reported that the compressors were fully balanced and would not induce vibrations on the common platform.[25]  Berge wanted GE's involvement in the compressor systems design in part because Aibel had not previously packaged compressors for FPSOs and Flotech had not previously packaged compressors of the size required for the *Berge Helene* project.[26]  GE does not argue or cite evidence establishing that it was unaware of Berge's particular purpose or interest in GE's oversight over the design of the compressor systems.

### c.   Notice of Breach of Warranty

A buyer who has accepted goods must notify the seller within a reasonable time after the buyer discovers, or should have discovered, any breach of warranty.  TEX. BUS.

---

[24]    Berge Ex. 2 at BER000681-BER000683, BER000649.

[25]    Berge Ex. 97, Vogt Depo. at 26-29, 34-45.

[26]    Resp. at 5 (citing Berge Ex. 98, Svendsen Depo. at 45-47; Berge Ex. 13, Svendsen Decl.); Berge Ex. 97, Vogt Depo. at 35-36 ("Flotech had previously only packaged smaller compressors").

& COM. CODE § 2.607(c)(1).   The evidence shows that, once performance problems appeared on the *Berge Helene*, Berge and GE communicated directly and GE had notice of the performance issue.[27]   Later, in December 2006, GE also conducted its own internal review and determined that the compressors were overloaded by approximately 46%.[28]

### d.    Plaintiff Suffered Injury

Berge must also establish that it suffered injury, such as economic loss.   *See* TEX. BUS. & COM. CODE § 2.714.   Berge produces evidence that it could not collect $17,710,486 in base day rates that Woodside withheld due to the FPSO and compressors' failure to meet the contracted oil production rate.   Berge also has produced evidence of other claimed economic injuries.[29]   While there are complex issues regarding whether any of these damages are recoverable, GE does not establish on summary judgment an absence of a genuine fact question whether Berge suffered some injury.

### e.    Cause of Plaintiff's Injury

Last, in order to recover on its implied warranty claim, Berge must establish that its injury was caused by GE's breach of warranty.   "Cause in fact" requires that the defendant's conduct or product be a substantial factor in bringing about the injury which would not otherwise have occurred.   *JCW Elecs., Inc. v. Garza*, 176 S.W.3d 618, 631 (Tex. App.—Corpus Christi 2005, *reh'g overruled*) (citing *Prudential Ins. Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 161 (Tex. 1995), *rev'd on other grounds*, 257 S.W.3d 701 (Tex. 2008)).   In order to recover consequential or special damages, Berge will also have to establish that GE's breach of its warranty proximately caused Berge's injuries. *See* TEX. BUS. & COM. CODE § 2.715.   Proximate cause consists of both cause in fact and foreseeability.   *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995) (citing

---

[27]    Compl. ¶¶ 55-63; Berge Ex. 63 (Minutes of Compressor Technical Meeting in which GE did not participate but GE representatives were copied); Berge Ex. 69 (GE email and action item list on which Berge was copied).

[28]    Resp. at 16 (citing Berge Ex. 56).

[29]    *See infra* p. 36.

*Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992)).[30]  On both these aspects of causation, Berge has produced evidence that establish genuine material fact issues.  Berge points out that the compressors stopped working numerous times and that the disruptions with the compressors and associated equipment began within a year of completion of the FPSO renovations in approximately Fall 2005.[31]  Berge contends the disruptions were related to the compressors' inadequate rod load capacity and rotational speed,[32] and that GE knew that certain capacities and speeds were necessary to achieving the FPSO's contracted production rate.[33]  GE counters with evidence suggesting that the compressor problems were due to the oil field conditions, which were materially different from the field information originally provided to GE.[34]  GE further argues that the differences in field conditions were "clearly a change to BOD [Basis of Design]," "mak[ing] the running of any compressor a challenge."[35]  In addition, GE notes that, "[d]ue to excessive

---

[30]    The Court also discusses proximate cause *infra* p 37.

[31]    MSJ Express (citing GE Ex. 2 at BER136534).

[32]    *See* Resp. at 16 (citing Berge Ex. 56 (GE email from Pratesi noting various compressor overloads; presentations detailing compressor failures); Berge Ex. 107, Pratesi Depo. at 242–247; Berge Ex. 110, Gajjar Depo. at 269).  Berge also argues that the final stage cylinders on the *Berge Helene* have a significant design flaw, that GE's use of certain materials led to "explosive decompression" and "gas leaks," and that as a result of external bolts coming loose on the "adapter plates" for the compressors' third stage cylinders, Resp. at 18 (citing Berge Ex. 87, Duckett Depo. at 45-48; Berge Ex. 47), a third stage cylinder explosively separated from the side of one of the compressors after approximately 100 hours of operation.  Resp. at 48.  The Court does not decide at this time issues of whether there are such flaws or the amount of injury or damages Berge suffered.

[33]    *See* Berge Ex. 2 at BER000681-BER000683.

[34]    MSJ Implied at 9 (citing GE Ex. 17, Aibel Production Optimization Report at BER010417; GE Ex. 18 at BER021441 (email from Overstad noting "Banda well is not able to receive > 61 Mscf/d due to increased well head pressure . . . we are not able to inject required amount what so ever due [sic] reservoir reasons"); GE Ex. 9, Overstad Depo. at 205 (responding affirmatively that "Banda's ability to take gas is limiting the injection").  The Banda field is a reservoir where excess gas is injected for storage.  MSJ Implied at 9.  GE argues that varying field conditions in the Banda field are a reason for Berge's difficulty in injecting gas.  *Id.*

[35]    MSJ Implied at 9 (citing GE Ex. 20 at BER012868) (letter by Aibel noting that despite the BOD indicating a minimum of 13.4 barg "gas arrival" pressure, the gas arrival pressure varied from 4 to 30 barg).

flaring caused by unstable reservoir conditions," Berge renegotiated its contract with Woodside in March 2007,[36] indicating that the field conditions originally reported to Aibel, GE, or Flotech may have changed over time, an occurrence for which GE may not have been responsible.[37] The reasons for the equipment problems and disruptions in production thus are genuine material questions of fact, as are the fact questions about who provided the information about the field conditions to GE and whether that information was accurately reported.[38]

Berge accordingly has produced evidence sufficient to establish genuine issues of material fact on each element required for its claim of breach of implied warranty of fitness for a particular purpose. GE's motion is denied on this claim.

### 4.    Breach of Express Warranty

#### a.    Elements of the Claim and Legal Standards

To establish a claim for breach of express warranty, a plaintiff must establish that:

(1)    the defendant-seller made an express affirmation of fact or promise by seller relating to goods,

(2)    such affirmation of fact or promise by seller became a part of basis of bargain,

(3)    the plaintiff relied upon said affirmation of fact or promise,

(4)    the goods failed to comply with affirmation of fact or promise,

(5)    the plaintiff was injured by such failure of product to comply with express warranty, and

---

[36]    MSJ Implied at 10 (citing GE Ex. 23 at BER015674 (letter from Berge to Woodside noting "surging/fluctuation in pressure caused by reservoir conditions")).

[37]    Berge replies that any field restrictions, if they existed, would only have affected the compressors' capacity to inject gas, not the compressors' ability to lift gas. Resp. at 22-23. Gas injection involves injecting excess gas into an underground cavity for storage. Gas lift involves injecting gas into oil production lines to lower specific gravity and improve the flow of hydrocarbons. *Id.* at 22.

[38]    According to GE, the 2001 Aibel-Berge contract recognized that Aibel was relying on information about reservoir properties of the field and that this information presumably was provided by Berge. MSJ Implied at 9 n.2 (citing GE Ex. 4, Aibel-Berge Operations Agreement, Art. 6.03 at BER139575 (providing that Aibel is relying on Berge's "information relating to the reservoir properties of the actual production field and environmental information given by it").

(6)      the failure was proximate cause of the plaintiff's injury.

*See* TEX. BUS. & COM. CODE § 2.313; *Johnson v. Philip Morris*, 159 F. Supp. 2d 950 (S.D. Tex. 2001) (citing TEX. BUS. & COM. CODE § 2.313(a)(1)); *Morris v. Adolph Coors Co.*, 735 S.W.2d 578, 587 (Tex. App.—Fort Worth 1987, writ ref. n.r.e.) (citing *Gen. Supply & Equip. Co., Inc. v. Phillips,* 490 S.W.2d 913, 917 (Tex. Civ. App.—Tyler 1973)).  The Court has already determined that under that Texas law contractual privity between Berge and GE is not required for an express warranty claim by Berge against GE.[39]  Further, the analysis of the fifth and sixth factors for an express warranty claim (injury caused by a breach of warranty) overlap substantially with the fourth and fifth factors on Berge's claim of breach of implied warranty for fitness for a particular purpose.  Berge has shown there are material questions of fact on those factors.[40]  The Court, accordingly, focuses on the other four factors for Berge's express warranty claims, setting forth the legal standards and then analyzing each of the statements on which Berge relies.

To prevail under a breach of express warranty theory, a plaintiff also must establish that a seller made or used (i) affirmations of fact or promises, (ii) descriptions, or (iii) samples or models relating to the goods to be sold.  *See* TEX. BUS. & COM. CODE § 2.313(a).  A mere affirmation of the value of goods or a statement of the seller's or lessor's opinion or commendation does not create an express warranty.  *Id.* § 2.313(b); *see Singleton v. LaCoure*, 712 S.W.2d 757, 759 (Tex. App.—Houston [14th Dist.] 1986, ref. n.r.e) (holding that salesman's failure to disclose that trailer had been in accident, and statement that he had "just the trailer" for purchaser, did not create express warranty).  The test for distinguishing an express warranty from a mere expression of opinion is whether the seller was asserting a fact of which the buyer was ignorant, or whether the seller merely expressed a judgment of something about which the buyer and seller might each be expected to have an opinion.  *U.S. Pipe & Foundry Co. v. City of Waco*, 108 S.W.2d 432, 436 (Tex. 1937); *Gen. Supply & Equip.*, 490 S.W.2d at 917 (upholding jury

---

[39]      *See* discussion *supra* p. 15.

[40]      *See* discussion *supra* p. 21.

24

decision); *Valley Datsun v. Martinez*, 578 S.W.2d 485, 490 (Tex. Civ. App.—Corpus Christi 1979, no writ) (holding that dealer's statement that camper was in "excellent condition" was warranty, not mere "dealer's talk").[41]

In addition, the plaintiff must prove that the affirmation of fact, promise, description, or sample claimed by the plaintiff (collectively, "affirmation") became a part of the basis of the bargain and that plaintiff relied in some way on the affirmation.[42] *See Amer. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 436 (Tex. 1997) ("Basis of bargain loosely reflects common law express warranty element of reliance."). An affirmation that does not become part of the basis of the bargain does not create an express warranty. *See Zak v. Parks*, 729 S.W.2d 875, 881 (Tex. App.—Houston [14th Dist.] 1987, no writ) (holding that seller's alleged representation that house had no defects did not create warranty because between time of representation and sale, buyer *inter alia* inspected home four times, asked another realtor to inspect house twice, and hired inspection services company to conduct structural inspection, and parties entered into earnest money contract limiting liability of sellers for foundational work). Essentially, a plaintiff must prove some reliance on the defendant's affirmation, but the degree of reliance needed is not great. *See Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 676-77 (Tex.

---

[41]     Affirmations made after a bargain is made generally do not give rise to express warranties. *See Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 560 (S.D. Tex. 1997) (citations omitted) ("The very purpose of the statutory [disclaimer] requirement is that any limitation be brought to the attention of the buyer at the time the contract is made. An attempted limitation at the time of delivery long after a contract of purchase is signed does not accomplish this purpose, being a unilateral attempt of a party to limit its obligations.").

[42]     Although some cases list "basis of bargain" and "reliance" as separate elements, other courts blend them together because of their conceptual overlap. *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 99 (Tex. 2004) ("While 'particular' reliance may not be necessary, we have held several times that something rather like it is."); *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 676–77 (Tex. 2004) (noting varied interpretations of the level of reliance required by the "basis of bargain" element); *Indust-Ri-Chem Lab., Inc. v. Par-Pak Co.*, 602 S.W.2d 282, 293-94 (Tex. Civ. App—Dallas 1980, reh'g. denied) (noting that in some instances, a jury instruction on lack of reliance may be germane to the "basis of the bargain" issue; "the weight of authority does not require reliance as an element to recover on an express warranty").

2004);[43] *Crosbyton Seed Co. v. Mechura Farms*, 875 S.W.2d 353, 361 (Tex. App.—Corpus Christi 1994).   Generally, there is a presumption that any affirmation of fact, sample, and model with respect to a good is intended to become a basis of the bargain, but this is a question of fact.   TEX. BUS. & COM. CODE § 2.313 cmt. 6; *see also id.* cmt. 3 ("[N]o particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.   Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact.").

Last, a plaintiff must establish that the product failed to comply with an affirmation of fact.   For its express warranty claims, thus, Berge must prove the GE compressors did not meet one or more affirmations by GE.

### b.   Analysis of GE's Statements

*"No Problems."*— Berge has presented proof that GE's representatives asserted prior to the purchase of the compressor module that the compressors would offer "no problems" and would provide "problem-free" operation,[44] and claim these constitute actionable warranties with regard to the reliability and suitability of the compressors delivered for the *Berge Helene*.  GE argues that statements such as "no problems" and "problem-free" are not actionable because a statement must be about the "title, quality, or character" of goods.   The Court holds that there is a fact issue whether, in context,

---

[43]     In *Lapray*, the Texas Supreme Court considered a lower court's decision to affirm a class certification.   135 S. W. 3d at 673.   As part of the discussion of whether Texas law was controlling, the Supreme Court reviewed the elements of express warranty claims in various states, including the reliance requirement.  *Id.*  The Court noted that under Texas law, "reliance is . . . not only relevant to, but an element of proof of, plaintiff's claims of breach of express warranty (to a certain extent) . . . ." *Id.*  (citing *Henry Schein v. Stromboe*, 102 S.W.3d 675, 686 (Tex. 2002) (noting that reliance is an element of breach of express warranty)); *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997) ("Though not a fraud-based claim, an express warranty claim also requires a form of reliance.").   The court ultimately held that the predominance requirement for class action certification was not met.  *Lapray*, 135 S.W.3d at 681.

[44]     Berge's evidence is that these statements were made by GE Sales and Marketing Manager de Jong at the Oslo meeting.  Berge Ex. 98, Svendsen Depo. at 54-56, 66; GE Ex. 35 at BERG000593 (handwritten note by Svendsen noting "problem free" and "no problems").

GE's representatives' statements of "no problems" constituted actionable affirmations of fact or expression of mere opinion or puffing.  Although, "[g]enerally, a warranty describes the 'character, quality, or title' of that which is being sold," *Chilton Ins. Co. v. Pate & Pate Enter., Inc.*, 930 S.W.2d 877, 890 (Tex. App.—San Antonio 1996, writ denied) (emphasis added), Texas appellate courts have also held that statements that a product is in "excellent" or  "perfect" condition may create express warranties.  *See Chrysler-Plymouth City, Inc. v. Guerrero*, 620 S.W.2d 700, 705 (Tex. Civ. App.—San Antonio 1981, no writ) (affirming jury's finding that "Top Quality" in written warranty for used car constitutes an express warranty); *Rinehart v. Sonitrol of Dallas, Inc.*, 620 S.W.2d 660 (Tex. Civ. App.—Dallas 1981, reh'g denied) (a "guarantee[]" that burglar alarm system "will [after a certain period] detect and the central station will report to the proper authorities, any forcible entry or attempt thereat into the protected area of the client's building" is a promise which relates to the alarm system); *Valley Datsun v. Martinez*, 578 S.W.2d 485, 490 (Tex. Civ. App.—Corpus Christi 1979, no writ) (dealer's statement that camper was in "excellent condition" was warranty, not mere "dealer's talk"); *see also U.S. Pipe & Foundry Co. v. City of Waco*, 108 S.W.2d 432, 436 (Tex. 1937) (pre-U.C.C. case holding that statements that "pipe would be entirely satisfactory" and that  "there was no doubt that the pipe would stand," considered in context, not as isolated statements, amounted to an express warranty of the fitness of pipe for intended use).

GE also argues that the "no problems" referred only to the "delivery" of the compressor model to Berge[45] and that the statements regarding the delivery were made "after Berge purchased the compressor."[46]  Berge has raised a genuine issue of material fact about the timing when made and the scope of what "no problems" covers.

---

[45]     MSJ Express at 14 (citing GE Ex. 33 Svendsen Depo. at 67, 94).  Berge contends that "delivery" covers a greater range of services, including "whatever technical clarification that was needed" and the "technical interfaces between the parties."  Resp. at 5 n.5 (citing GE Ex. 98, Svendsen Depo. at 56-57).

[46]     *See* MSJ Express at 17.

Accordingly, GE's request for summary judgment that these statements are not "affirmations" is denied.

**Rotational Speed and Gas Rod Load.—** Berge argues that GE's February 2004 Data Sheet and the Flyer expressly warranted that the compressors could withstand rotational speeds of up to 1,200 rpm and 72,752 or 72,000 pounds gas rod load.[47] These figures relate specifically to the "title, quality, or character" of the compressors. GE does not argue to the contrary. Rather, GE contends that Berge could not have reasonably relied on any Data Sheet because it contained an express disclaimer of liability.[48] GE contends also that Berge could not have reasonably relied on GE's materials because the Packager Manual on the compact disk detailed the scope of GE's express warranty and included a disclaimer of creation of the warranty on which Berge relies.

There is no dispute that, as of February 2004, Berge physically had a copy in its possession of the February 2004 Data Sheet and the Packager Manual.[49] Assuming without deciding that any reliance must be reasonable for an actionable express warranty claim,[50] the Court finds that there are genuine material fact issues whether Berge relied on the February 2004 Data Sheet representations that the compressors would reach and operate at a rotational speed of 1,200 rpm and 72,752 rod load capacity, and whether that reliance was reasonable in light of the putative disclaimer on the bottom of the Data Sheet.[51] The disclaimer on the very bottom of the February

---

[47]     The Data Sheet states 72,752 for "R/L tension" and "R/L compression." GE Ex. 46; Berge Ex. 2 at BERG000649. The Flyer states 72,000 lb. gas rod as the "Max Rod Load-Gas." Berge Ex. 2 at BER00683. Both the Data Sheet and the Flyer state 1,200 as the maximum rpm.

[48]     MSJ Express at 18 (citing GE Ex. 11 at BER000649).

[49]     *See* discussion regarding different versions of the Data Sheet *infra* p. 48.

[50]     MSJ at 20. The cases on which GE relies, *Lapray*, 135. S.W.3d at 677, *Gen. Motors Corp. v. Garza*, 179 S.W.3d 76, 82 (Tex. App.—San Antonio 2005, no pet.), and *PPG Indus.*, 146 S.W.3d at 99, discuss the reliance requirement but do not hold that a purchaser's reliance must be "reasonable."

[51]     *See* discussion regarding the enforceability of disclaimers *infra* p. 41. A buyer's knowledge of a seller's warranty disclaimers and damages limitations is highly relevant.

2004 Data Sheet was difficult to read and understand. The disclaimer in the Packager Manual was very hard, at best, to locate in the compact disk.  Further, noted above, reliance is only minimally required for an express warranty claim.  *See Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 676-77 (Tex. 2004); *Indust-Ri-Chem Laboratories, Inc. v. Par-Pak Co.*, 602 S.W.2d 282 (Tex. Civ. App.—Dallas 1980, no writ) (citing *e.g.*, *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1012 (5th Cir. 1972) (holding that government plaintiff's failure to conduct a "100% final inspection" did not preclude it from any remedy for breach of warranty because a buyer is entitled to rely upon the express warranty of seller, especially where the warranty is descriptive and the defects are not readily apparent)) (observing that a buyer may recover for breach of warranty despite failure to exercise reasonable care to discern whether the goods are defective).

The fourth element of an express warranty claim is that a plaintiff must prove that the goods failed to comply with an affirmation of fact or promise.  There are numerous genuine and material fact issues here.  Berge has produced meaningful evidence that the compressors have not, since early on, complied with GE's affirmations that they would reach a rotational speed of 1,200 rpm on a continuing basis[52] and would be capable of regularly operating at a gas rod load capacity of 72,752 pounds.[53]  Second, GE witnesses stated that GE set the gas rod load with

---

[52]     There is evidence, for example, that the third-stage cylinder in the compressors had never operated at 1,200 rpm previously and was found to have severe harmonic problems when it was operated at that speed for the first time at 1,200 rpm.  Resp. at 16 (citing Berge Ex. 80 at FLT-0083 (Flotech email stating that "only 3 of those cylinder service [sic] running at 1,200 RPM in the whole world, and you can guess where they all are!" and that the cylinders are "WRONG for 1,200 rpm service").  Testing in 2007 also determined that the cylinder's internal gas passages or valve nests created destructive harmonic pulsation when operated at 1,200 rpm.  Resp. at 16.

[53]     For example, it appears that GE now uses for the compressor model in issue a "compression figure" of 60,000 (the figure when the compressor can bear greater load) and a "tension" figure of 50,000 (the figure at which compressor can bear weaker load).  *See* Resp. at 6 n.6, 13 (citing McKee Decl. ¶ 15 (citing Ex. J)); Berge Ex. 61 at GEOG013527 (GE Presentation dated May 4, 2007); Berge Ex. 71 (GE Email dated February 17, 2008 with Excel chart indicating rod load tension of 50,000 and rod load compression of 60,000 pounds); Berge Ex. 77 at GEOG117192 (GE Email dated December 15, 2008 indicating the same)).  With Berge,

reference to forces that the model's strongest parts could withstand. [54]   Berge counters that GE's gas rod load settings for the *Berge Helene* are not the industry standard and, if such a standard exists in some quarters, Berge was not made aware of it.[55]   Also, other evidence of record indicates that industry practice generally is to set the maximum gas rod load with reference to the weakest parts of a compressor.[56]   Third, there are genuine fact questions regarding whether GE left enough "leeway" between the estimated and maximum allowable loads, as customarily is done.[57]   Summary judgment on Berge's express warranty claim arising from the February 2004 Data Sheet and Flyer's use of 1,200 rpm rotational speed and 72,752 pounds gas rod load is denied.

*GE's Involvement in the Compressor Package Design.*— Berge also argues that GE and its agents Flotech and Aibel expressly warranted that GE would be involved in the audit of the package design process.[58]   There is also evidence that GE was aware that the Packet intended for Berge stated, "GE Oil & Gas will provide advice on package design, assistance with commissioning and start up and training

---

GE used 72,752/72,752 as the maximum gas rod loads in its promotional materials to Berge in 2004.  Resp. at 6 (citing Berge Ex. 2 at BER000649).

[54]     Resp. at 12 (citing Berge Ex. 100, McDonald Depo. at 115; Ex. 107, Pratesi Depo. of May 8, 2011 at 30-31; Berge Ex. 108, Sarshar Depo. of May 23, 2011 at 35-36, 71-81; Berge Ex. 110, Gajjar Depo. at 78-84).

[55]     *See id.* at 16.

[56]     *Id.* at 10 (citing McKee Decl. ¶¶ 5-7; 11-15; Berge Ex. 107, Pratesi Depo. of May 18, 2011 at 101-05; 231-32; Berge Ex.104, Keifer Depo. at 104).

[57]     *Id.* at 11 (citing Berge Ex. 88, Broadbent Depo. of Sept. 27, 2010 at 81-82, 237-288).

[58]     *Id.* at 43-44; Resp. at 8 (citing Berge Ex. 26, Email from Aibel, dated February 20, 2004 (noting that GE would take an "audit role" and "provide[] a third level of quality assurance"); Berge Ex. 93, Karlsen Depo. at 234-43; Berge Ex. 96, Normann Depo. at 128-129, 202-12; Berge Ex. 92, Kristiansen Depo. at 230-37; 27; Kristiansen Decl.  ¶¶ 8-9; Svendsen Decl. ¶ 8). For example, GE Marketing and Sales Representative de Jong stated in his notes that Berge "appeared to be [sic] like our approach of gratuitous advice to review Flotech design."  Berge Ex. 21.

(free of charge) for operations and maintenance personnel."[59]   GE contends that its statements about project design are not factual affirmations or descriptions about the quality or nature of the goods and thus do not constitute a warranty.   GE argues these statements are insufficient, as a matter of law, to serve as the basis for an express warranty claim because express warranties must relate to the characteristics or quality of the goods being sold.

GE's commitment to provide "package design" relating to the compressors is not a statement about "goods," but one about rendering a "service."   The sale of services can give rise to a breach of warranty claim.   *See Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 574-75 (Tex. 1991).[60]   However, Berge has not produced evidence that GE's audit of the package design was inadequate or faulty, for example, by producing evidence that GE assigned unqualified employees to the project.   *See Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 747 (Tex. App.—Fort Worth, 2005). In a claim for breach of service warranty, "[i]t is the character and quality of the end product of the contract for [ ] services that determines whether there has been a breach of warranty."   *Chilton Ins. Co. v. Pate & Pate Ents., Inc.*, 930 S.W.2d 877, 890-891 (Tex. App.—San Antonio 1996, writ denied).   Because there is no dispute that GE in fact did participate in the package design, and Berge points to no promises about the quality of GE's work in that narrow respect, Berge has failed to raise a genuine material question of fact that GE failed to perform to the extent it promised.[61] Therefore, GE is entitled to summary judgment on Berge's package design theory.[62]

---

[59]     In the Packet sent to Berge after the February 2004 Oslo meeting, one document stated that Aibel and Flotech would "take responsibility for the entire compression module; GE Oil & Gas will provide advice on the package design, assistance with commissioning and start up and training (free of charge) for operations and maintenance personnel."  Berge Ex. 2 at BER000638; GE Ex. 11 at BER000638.   Berge does not meaningfully argue that GE's "assistance with commissioning and start up and training (free of charge) for operations and maintenance personnel" were deficient.

[60]     For example, DTPA claims for breach of warranty of service may include a "failure to perform under an advertising sales agreement."  *See id.*

[61]     To the extent that Berge argues that GE failed to provide any auditing of the package design, this is a breach of contract rather than a breach of warranty.  *See and compare Sw. Bell*

***Stainless Steel Rods.***— Berge claims that GE warranted the compressors would contain stainless steel rods and then supplied carbon steel rods instead. According to Berge, GE's technical specification sheets and drawings stated that piston rods would be stainless steel.[63] Berge has presented proof that stainless steel is more fatigue resistant than piston rods made from carbon steel used in the *Berge Helene* compressors, and that the absence of stainless steel rods may have contributed to the compressors' failures.[64] GE argues that there is no evidence that Berge expected to be

Tel. Co., 811 S.W.2d at 574-76, *and Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d at 747, *with Lyda Constructors, Inc. v. Butler Mfg. Co.*, 103 S.W.3d 632, 637 (Tex. App—San Antonio 2003, no pet.), *and Donnelley Marketing v. Lionel Sosa, Inc.*, 716 S.W.2d 598, 604 (Tex. App.—Corpus Christi 1986, reh'g denied).

[62] The Court does not reach the issues of whether Berge can satisfy the fifth and sixth elements of a breach of warranty claim regarding GE's "package design" service.

[63] Berge has not pleaded in the Complaint [Doc. # 1] facts about or a claim regarding the absence of stainless steel rods in the compressors. During the course of discovery, however, the issue of whether or not the rods were to be stainless steel was repeatedly addressed. As GE observed: "Berge made [the provision of stainless steel piston rods] a subject of nearly every deposition, parading marketing materials mentioning stainless steel rods and engineering drawings depicting stainless steel rods. . . ." MSJ Express at 20. In effect, Berge has sought an out-of-time pretrial amendment of its Complaint to include the steel rod issue. GE has shown no prejudice. Pretrial amendments should be permitted by the court "freely" "when justice so requires." FED. R. CIV. P. 15(a)(2). Also, even trial amendments to pleadings are to be "freely permit[ted] . . . when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that evidence would prejudice that party's . . . defense on the merits." FED. R. CIV. P. 15(b)(1). Berge's request is after expiration of the Court's scheduling deadline for amendments to pleadings in this case.[Docs. ## 20, 52]  Where a scheduling order that establishes deadline for amendments to pleadings has been entered, Federal Rule of Civil Procedure 16(b)(4) (2007), provides that the "schedule may be modified only for good cause and with the judge's consent." *See Marathon Fin. Ins., Inc. v Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009); *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008). Because the parties undertook discovery on the steel/carbon rods issue and GE does not suffer prejudice from the amendment, the Court finds there is a good cause to exercise its discretion to grant Berge leave to amend. The Complaint [Doc. # 1] is deemed amended to include a claim that stainless steel rods were expected and were the subject of a GE warranty.

[64] Resp. at 7 (citing Berge Ex. 66 (Goodman diagram showing 17-4 PH stainless steel); Berge Ex. 67 (Goodman diagram comparing 17-4 PH stainless steel and 4140 alloy steel); Berge Ex. 89, Pratesi Depo. of Oct. 6, 2010, at 204 (interpreting the Goodman diagrams to show that the "fatigue properties" of 17-4 PH stainless steel are superior to those of 4140 alloy steel); Berge Ex. 106, Casey Depo. at 47-49 (describing that, in a marine environment, 4140 alloy steel is less fatigue and corrosion resistant than 17-4PH stainless steel)). *See, e.g.*, Berge Ex. 56

32

provided stainless steel rods, or relied on such an expectation in making its bargain with Aibel to buy GE compressors.[65]   Berge counters with evidence that technical drawings and specifications provided to Berge after the February 2004 Oslo meeting[66] and upon delivery with the compressors reflected that piston rods were made of stainless steel.[67]   Berge also produces testimony that in the beginning of 2007, a Berge representative still understood the piston rods were made of stainless steel.[68]   Thus, there are genuine issues of material fact regarding (1) whether GE promised genuine stainless steel rods; (2) whether Berge expected stainless steel rods, and thus, whether stainless steel rods were a basis for the bargain or reliance by Berge; (3) whether the absence of stainless steel rods affected the rotational speed and the gas rod loads of the

(Pratesi email noting "the last failure on 2nd stage piston rod to crosshead flange connection looks like a fatigue failure that happened at the threaded end of the piston rod, which is the weakest point when piston rod is overloading . . .").

[65]     MSJ Express at 5 (citing GE Ex. 7, Bjerkem Depo. at 47, 50-55).  GE points to the minutes of a May 25, 2004 meeting between Berge and Woodside that state "compression system is all carbon steel."  MSJ Express at 5 (citing GE Ex. 30 at BER036052).  When GE accepted the purchase order in July 2004, it internally noted that Flotech did "not require Stainless Steel piston rods."  MSJ Express at 6 (citing GE Ex. 44 at GEOG151900 (GE email from De Jong noting "we may wish to change the piston rods to carbon steel, this should help with delivery" and "Flotech . . . does not require Stainless Steel piston rods"); GE Ex. 15 at GEOG152245).  In fact, GE produces evidence that a Berge representative involved in the February 2004 Oslo meeting was not aware that Berge "had a requirement for the piston rods to be stainless steel" or that Berge had "[made] it known to Aibel, that it, [Berge], required stainless steel piston rods on the compressors."  *See* GE Ex. 41, Kristiansen Depo. at 121-22.  Berge's own evidence shows that the composition of the piston rods was not the focus in 2004.  *See* Berge Ex. 109, Bjerkem Depo. at 44 (testifying that at that time, "[Berge] didn't have a big technical group of people who went into these types of details"); Kristiansen Decl. ¶ 14 (noting that the May 25, 2004 meeting was "not focused on the piston rod material" or "the composition of any of the individual internal components of the compressors themselves.").

[66]     Berge Ex. 2 at BER000641 (GE page in the Packet noting "17-4 PH Stainless Steel Piston rods with carbide coating in the piston box range").

[67]     Resp. at 7 (citing Berge Ex. 109, Bjerkem Depo. at 30-44 (testifying that the February 2004 promotional materials and post-delivery "final documentation" of the compressors showed that piston rods were in stainless steel).

[68]     *Id.* (citing Berge Ex. 89, Pratesi Depo. of Oct. 6, 2010, at 153-54 (testifying that at the beginning of 2007, " I was told they [GE] should have made it [piston rods] stainless steel 17-4 PH. . . .").

compressors; and (4) whether the use of carbon steel rather than stainless steel prevented problem-free operation of the compressors.

GE also argues that stainless steel rods substitution is not an actionable as a warranty claim because warranties are concerned with the character and quality of goods, "not strict compliance with the minutiae in contract terms." Reply at 24 (citing *Chilton Ins.*, 930 S.W.2d at 892 (holding that an agreement to clean up the project and to timely perform is contractual and not a warranty)). According to GE, failure to deliver steel rods thus, if anything, would be breach of contract, but not breach of warranty. *See Donnelley Marketing v. Lionel Sosa, Inc.*, 716 S.W.2d 598, 604 (Tex. App.—Corpus Christi 1986, reh'g denied) ("A warranty presupposes that the goods contracted for are the goods received. When the goods ordered and received fail to live up to the promises made regarding their performance, a breach of warranty action will lie . . . a breach of contract action lies when the goods ordered are not the goods received."). This legal issue is a close one. Berge claims that less durable rods were a reason for the compressors' poor performance. The Court will not decide this legal question until it is ripe, if ever, after resolving the enumerated fact issues.

### 5.   Damages

#### a.   Measure and Types of Breach of Warranty Damages

The Court turns to issues raised by the parties regarding damages. The general measure of damages for breach of a warranty is the difference, at the time and place of acceptance, between the value of the goods as accepted and the value they would have had if they had been as warranted, "unless special circumstances show proximate damages of a different amount." TEX. BUS. & COM. CODE § 2.714(b); *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App.—Tyler 2003, no pet.); *Simmons v. Simpson*, 626 S.W.2d 315, 317 (Tex. Civ. App.—El Paso 1980, no writ) (citing *Valley Datsun v. Martinez*, 578 S.W.2d 485 (Tex. Civ. App.—Corpus Christi 1979, no writ)); U.C.C. § 2-714(b).

The Texas U.C.C. also permits the recovery of incidental and consequential damages proximately caused by a seller's breach of warranty. TEX. BUS. & COM.

CODE § 2.715.  Incidental damages include any reasonable expense incident to the breach, including "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."  *Id.* § 2.715(a). Consequential damages include "any loss resulting from the general or particular requirements and needs that the seller had reason to know at the time of contracting and that could not reasonably be prevented by cover or otherwise,"  *Id.* § 2.715(b), including foreseeable lost profits.  *Polaris Indus.*, 119 S.W.3d at 336-37.  The distinction between direct, incidental and consequential damages is sometimes cloudy. *See* 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 10-4 (5th ed. Supp. 2010) (observing with reference to the U.C.C. generally that consequential damages sometimes may overlap with the direct "difference-in-value" damages recoverable under section 2-714 and incidental damages under section 2-715).

Parties to an agreement may provide for remedies for breach of warranty that add to, limit, or substitute for the remedies provided elsewhere under the Texas U.C.C. Thus, parties may limit a buyer's remedies to return and replacement of the goods or to refund of the price paid.  *See* TEX. BUS. & COM. CODE § 2.719(a).  If a limited remedy is provided as the exclusive remedy, then any intention of the parties to make a remedy exclusive must be clearly expressed.  *Id.* § 2.719(b).

If the buyer can establish that a limited or exclusive remedy provided in a contract "fails of its essential purpose," the buyer may disregard that term of the contract and pursue remedies to which the buyer otherwise might not have recourse. *Id.* § 2.719(b); *see Irwin v. Country Coach Inc.*, No. 4:05-CV-145, 2006 U.S. Dist. LEXIS 35463, at *18-*19 (E.D. Tex. Feb. 3, 2006); *Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 560 (S.D. Tex. 1997)).  In addition, parties may limit consequential damages unless the limitation is unconscionable.  TEX. BUS. & COM. CODE § 2.719(c); *e.g.*, *Morgan Bldgs. & Spas v. Humane Soc.*, 249 S.W.3d 480, 491-92 (Tex. App.—Beaumont 2008, no pet.); *Wade v. Austin*, 524 S.W.2d 79, 85-86 (Tex.

Civ. App.—Texarkana 1975, no writ).  Ultimately, any limitation of remedies must still leave the party against whom the limitation is to operate with a "minimum adequate" remedy or a "fair quantum of remedy."  TEX. BUS. & COM. CODE § 2.719 cmt. 1.

### b.     Types of Damages Claimed by Berge

In its Response [Doc. # 196], Berge identifies three categories of damages:

(i)     $17,710,486 for lost "base day rates" ("BDRs") that Woodside would have paid if Berge had been able to deliver gas compression at the contracted rate,

(ii)     $5.75 million for the purchase price of a supplemental compression module that would allow Berge to generate the full gas flow expected; and

(iii)    $17,899,185 for the transportation and installation costs of a supplemental module.[69]

GE argues that all three categories are consequential damages and thus are excluded by the damages limitations in the February 2004 Data Sheet, the Packager Manual, and the series of contracts associated with the *Berge Helene* refit, specifically, the GE-Flotech, Flotech-Aibel, Aibel-Berge, or Berge-Woodside agreements, executed on various dates between 2001 and 2004 (collectively, the "Contract Chain").  Berge correctly does not argue that any of the three categories of claimed damages are "general" damages that reflect the difference in value of the compressors as accepted and the value they would have had if they had been of the quality GE allegedly warranted.  *See* TEX. BUS. & COM. CODE § 2.714(b).[70]  Recoverability of Berge's damages thus turns on

---

[69]     Resp. at 23 (citing Berge Ex. 72 as lowest bid for supplemental compression module). *See also* GE Ex. 1, Woodside-Berge Agreement § 10, "Production Volumes," at BER00033; *id.* § 12.2(d), "Failure to Meet Required Water Injection Volumes," at BER000036; *id.* § 13.4(c), "Gas Reinjection: Excessive Flaring," at BER000037; *id.* Annexure B, "Schedule of Remuneration," at BER000080-BER000081).

[70]     MSJ Damages at 7-9.  Berge asserts that the lost BDRs "include a profit component but are largely compensation for Berge's capital expenses," including depreciation of the FPSO and its equipment.  Resp. at 21 (citing Berge Ex. 91, Overstad Depo. of October 27, 2010 at 99-100 (describing the BDRs as "payment for a capital investment of the vessel and technical equipment"); Berge Ex. 92, Kristiansen Depo. at 31-32 (describing BDRs as "the cost estimate

enforceability of GE's claimed damages limitations that exclude consequential and/or incidental damages. There are factual and legal issues concerning the enforceability of these disclaimers against Berge, as discussed below in Section III.C of this Memorandum, and GE's request for summary judgment limiting Berge's damages claims is denied.

### c. Proximate Cause Analysis

***Cause in Fact and Foreseeability.—*** In order to recover consequential or special damages, Berge must also establish that GE's breach of its warranty proximately caused Berge's injuries. *See* TEX. BUS. & COM. CODE § 2.715(b). Proximate cause consists of both cause in fact and foreseeability. *See Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *Mo. Pac. R.R. Co. v. Amer. Statesman*, 552 S.W.2d 99, 103 (Tex. 1977). Berge has produced evidence that the GE compressors' failure to operate reliably at a rotational speed of 1,200 rpm and a gas rod load capacity of 72,752 pounds may have caused compressor module failures resulting in Berge's inability to provide the required rate of gas compression under the Woodside contract.[71] Accordingly, Berge has established a genuine fact issue on the cause-in-fact requirement.

Berge also has established there are genuine material fact issues on foreseeability. Under the Texas U.C.C., there is no requirement that a buyer and seller "tacitly agree" that the seller be liable for consequential damages, though an aggrieved buyer must attempt to minimize its damages in good faith. *See* TEX. BUS. & COM. CODE § 2.715 cmt. 2. The U.C.C. requires that the seller, at the time of contracting,

---

of what we believe the work will cost us in US dollars")). *See also* GE Ex. 1, Woodside-Berge Agreement, Annexure B, "Schedule of Remuneration" (describing BDRs as the "fully inclusive rate for provision of the facilities only, including provision of space to subsea contractors for their plant and equipment . . . ."). Berge does not, however, establish how much of the lost BDRs or alleged capital expenses and depreciation resulted from the alleged breaches of warranties or how these types of damages constitute a measure of the difference in value of the compressors as promised versus those delivered.

[71]    Resp. at 16 (citing Berge Ex. 56 (Pratesi email discussing overload and fatigue failure with piston rods); Berge Ex. 107, Pratesi Depo. of May 18, 2011, at 242-47; Berge Ex. 62 (Flotech email stating that the cylinders are not suitable for 1,200 rpm full load operation)).

know or "ha[ve] reason to know" about the loss that would result as a result of a breach.  *See id.*  Berge has produced evidence, such as the Flyer and February 2004 Data Sheet, that GE was aware of Berge's contractual obligations to Woodside to supply 70 mmscfd of compression.[72]  The Court concludes therefore Berge has raised genuine issues of fact whether GE had "reason to know" about the risks to Berge of losing BDRs if the compressors did not perform to specification and about a possible need to purchase and transport a supplemental compressor if those GE supplied failed to perform as represented.  The foreseeability of various types of consequential damages must be decided at trial.

*Speculative Damages.*— Berge claims it needs (and has needed) a supplemental or replacement compressor to satisfy the Woodside-Berge contract requirements.  *See* Resp. at 47 (citing *Gen. Supply & Equip. Co., Inc. v. Phillips,* 490 S.W.2d 913, 917 (Tex. Civ. App.—Tyler 1973) (cost of future repairs included in damages calculation)).  GE argues that Berge's request is unreasonable and speculative because Woodside does not need more compression capacity and once the Woodside contract ends, Berge has no plans to use the *Berge Helene* elsewhere.  GE contends that Berge's damages claims to purchase and install a supplemental or replacement compressor "are too uncertain or speculative" and are by definition "not susceptible of being established by proof to that degree of certainty which the law demands."  *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098-99 (Tex. 1938).  *But see id.* at 1099 (citations omitted) ("The courts draw a distinction between uncertainty merely as to the amount and uncertainty as to the fact of legal damages.").

On the current record, there are genuine material fact issues about whether additional capacity beyond the amount Berge can deliver due to compressor module problems was, or is, necessary, or is speculative in whole or in part.  For example, Berge has demonstrated that it lost BDRs for some time in the past.  But, there is evidence that, since April 2008, the absence of full capacity of GE's compressors has

---

[72]      *See, e.g.,* Berge Ex. 2, Flyer at BER000681-BER000683; *Id.* Berge Ex. 2, February 2004 Data Sheet at BER000649.

not "triggered a penalty" against Berge.[73]   Apparently, Woodside has not specified dates "in the future when that [full] capacity might be needed" and, as of the time the parties' filed their briefs, there were no plans to extend the Berge-Woodside contract.[74] Berge contends that the "full 70 mmscfd of compression *may* be required," but does not cite non-speculative evidence that Woodside would so require under the existing or any future contract.[75]

### d.    Mitigation of Damages

Section 2.715(b) provides that plaintiffs can sue for consequential damages, including "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know *and which could not reasonably be prevented by cover* or otherwise."  (Emphasis added.)  GE argues under section 2.715(b) that spending $5 million to buy and $18 million to transport a supplemental compression model is "dramatic" and would constitute a failure to mitigate unreasonable damages.[76]  GE argues, alternatively, that Berge could increase suction pressure to regain reduced capacity.   Berge counters that it has already mitigated its damages as well as it can without an additional compressor.  For example, Berge accepted and attempted various GE suggestions for fixes to the compressors'

---

[73]      GE Ex. 38, Christiansen Depo. at 103 ("To date or since April 2008, I cannot state that there is any date that the capacity has been triggering a penalty.").  *See also* Berge Ex. 65, Variation to Woodside-Berge Agreement at BER000440 (reducing penalties for failure to meet required volumes under Clause 12.2(d), "Failure to meet required water injection volumes," and Clause 13.4(c), "Gas injection: Excessive flaring)".

[74]      GE Ex. 7, Bjerkem Depo. at 95-96, 105-06, 117-18 (stating that the extension of the Berge-Woodside contract was not "reasonably certain" and); GE Ex. 38, Christiansen Depo. at 104 ("I am not aware of any firm plans [for gas handling needs to exceed the current capacity of the compressors]"); GE Ex. 39, Johansen Depo. at 266-67) ("As far as I know, *Berge Helene* has no further assignments assigned for after 2013).

[75]      Resp. at 24.   Berge provides merely an employee's statement that there is "some indication that the current contract will be extended."  Berge Ex. 109, Bjerkem Depo. at 109-15. *See also* GE Ex. 38, Christiansen Depo. at 104 (stating that the requirement for gas compression is "very much still an issue to us," but not knowing whether there are actual plans for greater gas lift needs).

[76]      MSJ Damages at 13.

vibration and pulsation problems, such as reducing the compressors' capacity.[77] However, the compressors have continued to suffer piston rod failures.[78]   Berge also argues that the suction pressure of the compressors cannot safely be increased[79] until GE resolves ongoing problems of compressor vibration.[80]   Berge argues that even if GE's plan worked perfectly, the compressors would still be 10% below the 70 mmscfd compression requirement in the Woodside-Berge agreement.[81]   There remain material fact issues on the necessity of installation of a supplemental or replacement compressor.   Summary judgment in GE's favor in this regard is denied.

> **e.**      **Offset of Berge's Recoveries from Settlements with Others**

GE argues that Berge already has recovered $7 million from its contract partners and insurer, and that Berge would obtain a windfall if it could recover more than $40 million from GE for compressors that cost Berge only $593,679.[82]   Berge responds that it is pursuing its damages claims here—at least in part—on a subrogated basis for the insurer's benefit,[83] and that in any event, Berge did not obtain full recovery from its insurer because of large deductions and Norwegian insurance provisions that "prohibit or limit recovery for downtime on various technical grounds that have nothing to do with whether the downtime was caused by equipment flaws."[84]

---

[77]      Resp. at 23 (citing Berge Ex. 60 (GE emails discussing results of new compressor settings)).

[78]      *See, e.g.*, Berge Ex. 64, GE Report of Piston Rod Failure Analysis; Berge Ex. 73, GE Report on Compressor Piston Rod Damage Investigation.

[79]      Berge Ex. 94, Jacobsen Depo. of Dec. 17, 2010, at 217-18; Berge Ex. 101, Jacobsen Depo. of April 26, 2011, at 88, 108-10.   *See also* Berge Ex. 68; Berge Ex. 69 (indicating that more testing would be needed to assess whether increased suction pressures were feasible); Berge Ex. 74 (February 2008 study showing that increased suction is not feasible).

[80]      Resp. at 23 (citing Berge Ex. 85, Tolk Depo. at 173-75).

[81]      Resp. at 24 (citing Berge Ex. 89, Pratesi Depo. of Oct. 26, 2010, at 213).

[82]      Reply at 2-3; *see* GE Ex. 15 at GEOG152245.

[83]      Sur-Reply at 12.

[84]      Reply at 46 (citing Berge Ex. 83. Plaintiff's Responses and Objections to GE's Second Set of Interrogatories to Plaintiff; Berge Ex. 109, Bjerkem Depo. at 142-163).

Berge also notes that it recovered only $4 million plus interest from its insurer, that a settlement with Aibel required it to pay Aibel more than $1.2 million,[85] and that a $713,939.09 settlement with Woodside pertained to an issue that Berge did not assert in this case.[86]  Berge has established genuine issues material fact regarding the extent of Berge's recovery of compensable damages that it now seeks against GE.  Accordingly, summary judgment on this basis is denied.

### C.    Disclaimers of Warranty and Limitations of Damages

GE also argues that summary judgment is warranted because it effectively limited its liability through its disclaimers of implied and express warranties and limitations on damages.  These disclaimers or limitations appeared in (i) GE materials, including the February 2004 Data Sheet given to Berge and a compact disk containing the GE Packager Manual, as well as in (ii) the chain of contracts involved in the Chinguetti project, namely, the GE-Flotech, Flotech-Aibel, Aibel-Berge, and Berge-Woodside agreements executed on various dates between 2001 and 2004 (collectively, the "Contract Chain").  Because the statutory language and the courts' articulation of legal standards vary slightly regarding disclaimers or limitations of implied warranties, express warranties, and damages, the Court will first set forth the applicable law for each type of disclaimer or limitation and then analyze each under the applicable rules.

### 1.    Applicable Legal Principles

#### a.    Requirements for Disclaimers and Limitations

The Texas U.C.C. establishes the requirements for warranty disclaimers and damages limitations arising from breaches of warranties.  *See* TEX. BUS. & COM. CODE §§ 2.316 ("Exclusion or Modification of Warranties"), 2.719 ("Contractual Modification or Limitation of Remedy").  Although similar in effect, warranty disclaimers and damages limitations are legally distinct.  Section 2.316(d) expressly distinguishes the two by stating that "[r]emedies for breach of warranty can be limited

---

[85]    Berge argues that the settlement with Aibel was a "global settlement of a number of claims."  Sur-Reply at 46 (citing Berge Ex. 95, Buaroy Depo. at 91-93).

[86]    *Id.* at 12.

in accordance with the provisions of this chapter on liquidation or limitation of damages and on contractual modification of remedy (Sections 2.718 and 2.719)." Official Comment 2 to section 2.316 reinforces this point:

> This Article treats the limitation or avoidance of consequential damages as a matter of limiting remedies for breach, separate from the matter of creation of liability under a warranty. If no warranty exists, there is of course no problem of limiting remedies for breach of warranty. Under subsection (d) the question of limitation of remedy is governed by the sections referred to rather than by this section.

*See also FMC Fin. Corp. v. Murphee*, 632 F.2d 413, 420 (5th Cir. 1980) ("[W]arranty disclaimer is a defense to the existence of a cause of action, while the consequential damage limitation merely restricts remedies once the breach has been established. If there is no warranty because of a valid disclaimer, there is no problem of limiting warranty breach remedies.") (citing U.C.C. § 2-316 cmt. 2); 1 BARKLEY CLARK & CHRISTOPHER SMITH, THE LAW OF PRODUCT WARRANTIES § 8:30 (2010) ("a remedy limit is conceptually distinct from a disclaimer under § 2-316"). In their briefs, GE and Berge often argue indiscriminately about the warranty disclaimers and limitations of damages in GE's materials and the Contract Chain. Because the rules vary, the Court analyzes separately each category of disclaimer or limitation.

Because Berge is not in contractual privity with GE, the Court must also consider whether GE's disclaimers and limitations on damages are enforceable against Berge. In *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 82 (Tex. 1977), the Texas Supreme Court emphasized that a final product manufacturer can limit its liability from remote buyers—end-users who did not buy directly from the manufacturer—by modifying and excluding warranties, subject to section 2.316 of the Texas U.C.C. However, Texas courts have not clarified when and how a component manufacturer can disclaim liability from remote buyers.[87] Federal cases making "Erie guesses" interpreting

---

[87]    The parties have cited, and this Court's research has discovered, no Texas appellate authority addressing whether a component manufacturer that has direct dealings with a buyer

Texas law on this issue—expressly or implicitly—demonstrate that courts consider a variety of matters in determining whether a company is a final product manufacturer or a component manufacturer.[88]   Courts have considered the extent of contacts between the

retains the legal posture of a component manufacturer, rather than the posture of a final product manufacturer.

GE argues that, after *Nobility Homes*, Texas courts applying section 2.318 of the Texas Business and Commerce Code have held that so long as an end-user can sue a manufacturer without privity, an end-user may be subject to valid disclaimers and liability limits in the manufacturer's contract with the intermediary.   Implied MSJ at 26 (citing *Welwood v. Cypress Creek Estates, Inc.*, 205 S.W.3d 722, 729 (Tex. App.—Dallas 2006, no pet.); *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd.*, 146 S.W.3d 79, 88 n.35 (Tex. 2004); *Hou-Tex v. Landmark Graphics*, 26 S.W.3d 103, 110-11 (Tex. App.—Houston [14th Dist.] 2000, no pet.).   These cases do not consider the status of the defendant seller or manufacturer as a component or final product manufacturer, the issue under analysis.   *PPG Industries* and *Welwood*, for example, are cases that addressed and turned on plaintiffs' status as a party in the same position as the original product (or real estate) buyer.   *See Welwood, Inc.*, 205 S.W.3d at 729 (transferee was chairman of the company that originally negotiated, bought land lots under an "as is" agreement, and "had subjective knowledge of the 'as is' agreement and disclaimer of warranties"); *PPG Indus.*, 146 S.W.3d at 83 (transferee was the successive buyer of a skyscraper).   In these cases, there was also no dispute that the original or subsequent buyers had knowledge or notice of the disclaimers.   *See Welwood, Inc.*, 205 S.W.3d at 729 at ("Welwood [transferee] signed . . . "as is agreement" . . . and had subjective knowledge of the "as is" agreement and disclaimer of warranties.); *PPG Indus.*, 146 S.W.3d at 83 ("JMB [transferee] learned of the earlier window problems, and that to a limited extent [the window problems] continued" and bought the building "as is").   In *Hou-Tex*, the buyer was in horizontal privity with the manufacturer, *see Hou-Tex*, 26 S.W.3d at 109, not in vertical privity as in the instant case.

GE also relies on *Landmark Org., v. Tremco Inc.*, 2010 WL 2629863, at *10 (Tex. App.—Austin 2010).   The *Landmark* plaintiff hired Alpha Insulation & Waterproofing ("Alpha") to purchase, install, and complete a waterproofing system for a multi-level underground parking lot under the hotel building.   *Id.* at *1.   Alpha purchased a liner ("membrane") from the manufacturer Tremco.   When the membrane failed, the plaintiff sued the manufacturer Tremco.   Because it was clear that the membrane was only one part of the waterproofing system, the Austin Court of Appeals held that Tremco's disclaimers were valid against the plaintiff because the plaintiff had received, via Alpha, and approved Tremco data sheets containing a limitation of express and implied warranties.   *Landmark* thus is factually inapposite.   Therefore, the authorities on which GE relies are unavailing.

[88]   *Compare Hininger v. Case Corp.*, 23 F.3d 124, 129 (5th Cir. 1994) (making an *Erie* guess to hold, under Texas law, non-privity buyers could not assert breach of implied warranty claims against component manufacturers because, unlike final product manufacturers, "it may be difficult or even impossible for a component supplier to disclaim its warranty liability"), *and Patty Precision Prods. Co. v. Brown & Sharpe Manuf. Co.*, 846 F.2d 1247, 1257–58 (10th Cir.

company and buyer; the company's knowledge of the product's intended use and the warranty's intended beneficiary; the extent of advertising and branding of the component; the function and visibility of the component within the final product purchased by the buyer; the buyer's expectations; the company's ability to disclaim warranties to the buyer; and the company's control over the design, installation, and product support to the ultimate buyer. *See Hininger*, 23 F.3d at 127-129; *Patty Precision*, 846 F.2d at 1257-58 (Logan, J. concurring in part dissenting in part); *see also Clark v. DeLaval*, 639 F.2d at 1323-24.

To the extent that federal analysis is pertinent, the record here strongly supports GE being classified as a final product manufacturer, not the typical, generally anonymous, component manufacturer. For example, GE Sales and Marketing Manager de Jong and GE "RCT Leader" Hans-Christian Louis attended the February 2004 sales meeting in Oslo, Norway, with Berge.[89] Promotional materials provided to Berge during and after the meeting show that GE repeatedly promoted its brand, knew the intended use of its compressors on the Chinguetti project, and intended for Berge to rely on its involvement and representations.[90] The compressor was not the kind of small "hidden" component in the final product being delivered by Aibel to Berge that would be difficult for the component manufacturer to identify to the end-user and on which to assert

---

1988) (Logan, J., concurring in part and dissenting in part) ("Limitations of remedies and disclaimers of warranty are binding on subsequent buyers when the first buyer adds, assembles or incorporates the manufacturer's product into another item, or when the first buyer modifies or uses the manufacturer's product before resale"), *with Clark v. DeLaval*, 639 F.2d 1320, 1323-24 (5th Cir. 1981) (interpreting Texas law to hold that the manufacturer of a final product could not rely on a retailer's warranty disclaimer to insulate itself from liability because the retailer's disclaimer "would not, and ought not be deemed to, give a reasonable person (buyer) notice that the manufacturer was also disclaiming any implied warranties").

[89]   *See* Berge Ex. 17 (presentation agenda listing presentation team, including two GE representatives).

[90]   *See, e.g.*, Berge Ex. 11 (email from Flotech CEO Stephen Broadbent to GE representatives Coleman de Jong and Hans Christian Lous); Berge Ex. 12 (email history where Lous describes phone call with Berge representative); Berge Ex. 17 (email from Broadbent stating "Colman and I have drafted up a plan for our presentation next week").

disclaimers.  The compressors were also central to the performance of the compressor module and Berge's ability to meet its obligations under the Woodside-Berge contract. Despite this strong evidence, because the parties were not given notice of and have not briefed the issue, the interests of fairness dictate that the Court not definitively decide whether GE should be treated as a component or final product manufacturer for disclaimer purposes.  A final decision on this question will await trial.

### b.    Disclaimers of Implied Warranties – Conspicuousness

Section 2.316(b) of the Texas Business and Commerce Code governs the exclusion and modification of implied warranties.  It provides: "Subject to Subsection (c) . . . to exclude or modify any implied warranty of fitness the exclusion must be made by a writing and be conspicuous."  A disclaimer is "conspicuous" if it is written so that a reasonable person against whom it is to operate should notice it.  *See* TEX. BUS. & COM. CODE § 1.201(b)(10); *Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 559-60 (S.D. Tex. 1997) (citing *Cate v. Dover Corp.*, 790 S.W.2d 559, 560 (Tex. 1990) ("conspicuous" means "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it")); *Womco, Inc. v. Navistar Int'l Corp.*, 84 S.W.3d 272, 279-80 (Tex. App.—Tyler 2002, no pet.).

Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "there are no warranties which extend beyond the description on the face hereof."  *See* TEX. BUS. & COM. CODE § 2.316(c)(1).  Whether a disclaimer is sufficient is a decision for the court.  *Id.* § 1.201(b)(10).

### c.    Disclaimers of Express Warranties – Reasonableness

Section 2.316(a) of the Texas U.C.C. governs the validity of disclaimers and limitations on express warranties and provides that

> words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence . . . negation or limitation is inoperative to the extent that such construction is unreasonable.

If the fact-finder determines that a seller's statement created an express warranty, words purportedly disclaiming that warranty will be "inoperative" to the extent that the disclaimer is unreasonable. *Mobile Housing, Inc. v. Stone*, 490 S.W.2d 611, 615 (Tex. Civ. App.—Dallas 1973) (general disclaimer excluding expressed and implied warranties did not negate express warranties made to mobile home buyer); *Bowen v. Young*, 507 S.W.2d 600, 605 (Tex. Civ. App.—El Paso 1974, no writ) (express warranty survived a proper disclaimer under the U.C.C. where disclaimer was inconsistent with a "dickered term" at the heart of the bargain). Accordingly, the Court must determine whether each of GE's asserted express warranty disclaimers are "reasonable as consistent" with GE's alleged express warranties to Berge. TEX. BUS. & COM. CODE § 2.316(a).

### d.      Requirements for Damages Limitations

*Unconscionability.*— Section 2.719(c)  provides that limitations on consequential damages may not be unconscionable. As noted, substantive unconscionability occurs if the terms of the contract are one-sided or oppressive. *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex. Civ. App.—El Paso 1975). Procedural unconscionability occurs if the seller employed overreaching or sharp practices and the buyer was ignorant or inexperienced. *Arkwright-Boston Mfr. Mut. Ins. Co. v. Westinghouse Elect. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) (citing *Earman Oil Co. v. Burroughs Corp.*, 625 F.2d 1291, 1300) (5th Cir. 1980)). In determining whether a limitation on damages is unconscionable, a court must look to the circumstances surrounding the agreement; the alternatives, if any, that were available to the parties at the time of making the contract; the inability of one party to bargain freely; whether the contract is illegal or against public policy; and whether the contract is oppressive. *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 203-04 (5th Cir. 1987); *Wade v. Austin*, 524 S.W.2d at 86. Courts are especially likely to uphold liability limits for consequential damages in commercial transactions with sophisticated parties. 1 CLARK & SMITH, *supra*, § 8:30. Most courts also uphold the exclusion of damages for consequential economic loss, such as lost profits, downtime, and claims of third parties where there is evidence that the buyer was on notice of the limitation. *See Glidden Co. v.*

*CDNE, Inc.*, 2011 WL 686286, at *8 (Tex. App.—Tyler 2011); *Harper Bldg. Sys., Inc. v. Upjohn Co.*, 564 S.W.2d 123, 129 (Tex. Civ. App.—Beaumont 1978).

 ***Failure of Essential Purpose.***— Section 2.719(b) also provides that, if a buyer can establish that a limited or exclusive remedy provided in the contract "fails of its essential purpose," then the buyer may disregard that term of the contract and pursue remedies to which the buyer otherwise might not have recourse. *See Irwin v. Country Coach Inc.*, No. 4:05-CV-145, 2006 U.S. Dist. LEXIS 35463, at *18-*19 (E.D. Tex. Feb. 3, 2006); *Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 560 (S.D. Tex. 1997) (citing *Reynolds Metals*, 758 F.2d 1073, 1078 (5th Cir. 1985)).   The "failure of essential purpose" exception to the general right of sellers to limit liability under the U.C.C. "applies most obviously to situations where the limitation of remedy involves repair or replacement that cannot return the goods to their warranted condition." *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 292 (4th Cir. 1982); *see also* 1 CLARK & SMITH, *supra*, § 8:26 (noting that sellers often limit remedies for breach of an express warranty to repair and replacement of defective parts).   In such cases, a limited or exclusive remedy fails its essential purpose if the seller is unwilling or unable to repair the defective goods within a reasonable period of time. *Id*. § 8:26. Limited remedies have also been found to fail their essential purpose where the limited remedy would cause plaintiff to lose the "substantial value of their bargain," *see Viking Yacht Co., Inc. v. Composite One LLC*, 385 F. App'x 195, 207-08 (3d Cir. 2010); *Mercedes-Benz of N. Amer., Inc. v. Dickenson*, 720 S.W.2d 844, 854 (Tex. App.—Fort Worth 1986), or when "defects in the goods are latent and not discoverable on reasonable inspection." *See Marr Enters. Inc. v. Lewis Refrigeration Co.,* 556 F.2d 951, 955 (9th Cir. 1977) (citations omitted).

## 2.      Analysis of Disclaimers and Limitations

### a.      February 2004 Data Sheet

GE argues it is entitled to summary judgment because, prior to committing to purchase the compressors, Berge received the February 2004 Data Sheet containing GE's disclaimers of liability and damage limitations.[91]  This disclaimer provides:

> GEMINI GAS COMPRESSORS, its owners, affiliates, authorized distributors, or agents, assume no liability for any consequences, damages, or loss of production as a result of use or misuse of the information or calculations contained in this program.

Berge counters that the disclaimer is ineffective because the disclaimer's print was smaller than that used for the rest of the February 2004 Data Sheet, thus failing to meet the conspicuousness requirement under section 2.316(b) of the Texas U.C.C.

*Data Sheet as a Disclaimer of Implied Warranties.*— The February 2004 Data Sheet contains one provision that arguably is a disclaimer of warranties rather than a limitation of damages: GE "assumes no liability" for "any consequences" "as a result of use or misuse of the information or calculations contained in this program."  GE

---

[91]      MSJ Implied at 27; MSJ Express at 22.  There is a question regarding the timing and number of different versions of the Data Sheet received by Berge.  Berge clearly received a copy of the February 9, 2004 version of the Data Sheet (the February 2004 Data Sheet) shortly after the February 2004 Oslo meeting.  *See* Resp. at 6.

GE also argues that Berge received Data Sheets dated May 19, 2004 and August 13, 2004.  *See* Reply at 16 (emphasis added) (noting that "plaintiffs received data *sheets* . . . " and that "Berge indisputably received data *sheets* . . .");  GE Ex. 46 at FLT0121.1-FLT0121.4, BER001263, BER089492-BER089504.   Berge provides evidence that it received only the February 2004 Data Sheet prior to its decision to purchase the GE compressors.  Sur-Reply at 13 (citing Normann Decl. ¶ 4) ("To the best of my knowledge, the only data sheet in [GE Ex. 46] that we received prior to the sale of the compressors, or indeed prior to their delivery to the yard in Thailand, was [the February 2004 Data Sheet at BER000649], which was provided shortly after the meeting of February 4, 2004 [sic], together with other promotional materials.").  Berge acknowledges that it received certain other versions of the Data Sheet but "only long after the sale was concluded."  Sur-Reply at 13.  GE argues but does not raise a genuine fact issue that Berge received a May 2004 version of the Data Sheet prior to entering the contract to purchase.  All copies of the May 2004 Data Sheet in GE Exhibit 46 were produced by Flotech and there is no evidence these were in Berge's files.  *See* Normann Decl. ¶ 4.  The August 2004 versions are immaterial because they were prepared well after Berge agreed to purchase the GE compressors.  *See Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 560 (S.D. Tex. 1997).

argues that this statement limits the scope of any implied warranties because it is a conspicuous disclaimer.[92]  The Court is unpersuaded.  On the February 2004 Data Sheet the disclaimer is in tiny font with letters jammed together.  The font of the disclaimer is significantly smaller and less legible than the font used for the numerical data covering the rest of the Data Sheet and is materially smaller than a sentence regarding results that are "Out of Limits," which sentence appears immediately above the disclaimer.[93]  The key engineering data is at the top of the page, while the disclaimer is at the very bottom.  Nothing on the Data Sheet calls attention to the disclaimer.  Moreover, the disclaimer is ambiguous; it disclaims liability for "consequences [and] damages . . . as a result of use . . . of information or calculations contained in this program."[94]  Nowhere is the word "program" explained or defined. GE has produced no evidence that it drew Berge's representatives' attention to the disclaimer, thereby making it conspicuous in context.  *See Womco, Inc. v. Navistar Int'l Corp.*, 84 S.W.3d 272, 280 (Tex. App.—Tyler 2002, no pet.) (denying summary judgment because defendant produced no evidence that disclaimer was communicated to plaintiff).  GE's request for summary judgment that GE's disclaimer on the February 2004 Data Sheet precludes Berge's implied warranty claim is denied.

**Data Sheet as a Disclaimer of Express Warranties.—** GE also argues that the February 2004 Data Sheet language disclaiming GE's liability for "any consequences" forecloses Berge's express warranty claims.  Section 2.316(a) requires that disclaimers of express warranties be "reasonable as consistent" with the express warranties originally made to the buyer.  The Data Sheet states that the compressors have a

---

[92]     Reply at 19 (citing GE Ex. 46 at BER000649; *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 511 (Tex. 1993) (noting that "language in an extremely short document, such as a telegram, is conspicuous."); *Enserch Corp. v. Parker*, 794 S.W.2d 2, 9 (Tex. 1990) (enforcing indemnity clause where, *inter alia*, the contract consisted of one page and the clause is on the front side of the contract, not hidden under a separate heading, or surrounded by unrelated terms)).

[93]     *See* GE Ex. 46 at BER000649 ("Results which are Out of Limits are Highlighted.").

[94]     *Id.*

maximum rod load of 72,752 pounds and a maximum rotational speed of 1,200 rpm. To the extent the disclaimer is intended to foreclose GE's liability for "any consequences" as a result of use of all the information in the Data Sheet, the disclaimer appears to be substantively inconsistent with the document's express statements about maximum rod load and rotational speed.  *See Mobile Housing, Inc. v. Stone*, 490 S.W.2d 611, 615 (Tex. Civ. App.—Dallas 1973) (general disclaimer excluding express and implied warranties did not negate express warranties about type of carpet, window size, and other mobile home features made to buyer).  Moreover, the disclaimer is ambiguous in its reference to an undefined "program."  Nevertheless, the Court does not definitively decide the issue of whether the disclaimer in the February 2004 Data Sheet is consistent with the data representations in the document.  This is a question requiring trial.

Even if the disclaimer is substantively reasonable, there is a genuine question of material fact whether Berge had notice of the February 2004 Data Sheet disclaimer.  A disclaimer cannot be "reasonable" if a buyer does not have notice of it.  *See Womco, Inc.*, 84 S.W.3d at 280 ("[I]n order to be effective, a disclaimer of either an express or an implied warranty is required to be communicated, in the manner described in section 2.316(b), to the buyer before the contract of sale has been completed.").  Here, there is a genuine material question of fact whether Berge had notice, *i.e.*, an understanding of GE's interpretation of the ambiguous disclaimer on the February 2004 Data Sheet, prior to the purchase of the compressor modules.  Thus, summary judgment to GE is denied in this regard.

***Data Sheet as a Limitation of Damages.***— The February 2004 Data Sheet also provides that GE, "assumes no liability" for any "[d]amages" or "loss of production" "as a result of use or misuse of the information or calculations contained in this program."[95]  Even if the Court were to conclude that GE gave sufficient notice to Berge of the February 2004 Data Sheet disclaimer, the Court finds that GE is not

---

[95]     GE Ex. 46 at BER000649.

entitled to summary judgment that its February 2004 Data Sheet damages limitation forecloses Berge's claims for damages. As explained above, Texas U.C.C. § 2.719(c) permits limitations on consequential damages as long as the limitations are not unconscionable. Where the transaction is commercial and between sophisticated parties, courts are especially likely to enforce liability limits for consequential damages. *See* 1 CLARK & SMITH, *supra*, § 8:30. Berge does not argue that all the contracting parties in this case were not sophisticated. Accordingly, the exclusion of general and consequential damages in the Data Sheet does not appear substantively unconscionable; limitations on damages are common in contracts between sophisticated parties. *See, e.g., Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 204 (5th Cir. 1987) ("[N]o Texas case [has held] unconscionable a contract clause excluding economic damages on the sale of a commercial product.").

However, GE has failed to demonstrate that it meaningfully communicated the limitation by means of the February 2004 Data Sheet. Although the Texas U.C.C. § 2.719 does not require that damages limitations be conspicuous, courts often consider the degree of conspicuousness or whether a buyer had actual knowledge of a damages limitation in determining whether it is enforceable. *See Glidden Co. v. CDNE, Inc.*, 2011 WL 686286, *8 (Tex. App.—Tyler 2011) (upholding limitation of consequential damages where buyer and seller had been dealing with each other for nine years and evidence showed that the language of the limitation did not change over that period); *Morgan Bldgs. & Spas v. Humane Society*, 249 S.W.3d 480, 491-92 (Tex. App.—Beaumont 2008, no pet.) (upholding an exclusion of incidental and consequential damages because clause was in large conspicuous type and there was instruction in large uppercase letters immediately above signature line to read both sides of agreement). Unlike in most commercial contexts where the parties expressly allocate risk and negotiate terms of the contracts containing damages limitations, there is no evidence that Berge and GE treated the February 2004 Data Sheet as a contract after negotiating each of its terms. Indeed, there is no evidence whatsoever that GE or any

person brought the disclaimer to Berge's attention.  There is a genuine issue of fact whether the damages limitation in the February 2004 Data Sheet is procedurally unconscionable.  Summary judgment enforcing the February 2004 Data Sheet's limitation on damages is denied.[96]

### b.    Packager Manual

GE argues that the warranty disclaimers and limitations of damages in its Packager Manual given to Berge shortly after the February 2004 Oslo meeting are enforceable disclaimers of liability against Berge's implied and express warranty claims.  The warranty disclaimers include a provision stating that "maintenance or consumable parts are not warrantable."[97]  The damages limitations exclude: (1) "Towing Charges," "Expense[s] to remove or install product from attached equipment," and "Costs to transport product to the service facility"; (2) "Damages caused by over-pressurization, over-heating, freeze-up, sour gas, wet gas, overloading, flooding, fire, or contamination in the gas stream"; and (3) "Costs due to lost production."[98]  Berge counters that the disclaimer is ineffective because the materials on the compact disk on which the Packager Manual was stored were generic, the disk contained hundreds of different files,

---

[96]    The Court does not reach the issue of whether the damages limitation "fails of its essential purpose."  *See* TEX. BUS. & COM. CODE § 2.719(b).  However, it is noted that whether a limitation of remedies fails its essential purpose would require detailed factual inquiry into, for example, whether the damages limitation would cause plaintiffs to lose the "substantial value of their bargain."  *Mercedes-Benz of N. Amer., Inc. v. Dickenson*, 720 S.W.2d 844, 854 (Tex. App.—Fort Worth 1986) (a limited car warranty failed its essential purpose where warrantor was unable to correct all of the defects even though the buyer had returned the car for repairs at least seven times over an eight-month period and the transmission had been replaced at least twice).  *But see Lankford v. Rogers Ford Sales*, 478 S.W.2d 248, 251 (Tex. Civ. App.—El Paso 1972) (a limited car warranty did not fail its essential purpose where car was in repair shop for about 45 days for 50 different defects, but where "on each and every occasion that a defect has occurred, the same has been repaired [by dealer]" and plaintiff did not allege that dealer refused to make the repairs or was dilatory, careless or negligent).  The issue of whether a limitation fails its essential purpose may also require determination of whether the "defects in the goods are latent and not discoverable on reasonable inspection."  *See, e.g.*, *Viking Yacht Co. v. Composite One LLC*, 385 F. App'x 195, 207-08 (3d Cir. 2010).  Such determinations in this case require trial.

[97]    GE Ex. 13, Packager Manual, Art. 8.6, § 6.1.5.

[98]    *Id.*, Art. 8.7, § 6.1.1.

and nothing suggested that the Packager Manual was a sales or warranty-related agreement.

*Packager Manual as a Disclaimer of Implied Warranties*.— According to GE, the Packager Manual disclaimer is conspicuous because the Manual's table of contents contains entries labeled "Warranty Parts Reimbursement Policy"[99] and "Warranty Ineligible Warranty Expense Policy."[100]  This argument is unavailing.  The compact disk is labeled "Software and Technical Data" and contains 714 different files comprising 236 megabytes of information.[101]  GE's putative warranty only would be visible by clicking through four screens on the compact disk.[102]  The document containing GE's warranty policies is called a "Manual," not a contract or the like.  The pertinent document and section titles in the Manual are vague and do not convey that their contents relate to limitations of warranties or damages for the compressors or compressor modules as a whole.  GE does not present evidence that during its marketing meetings or otherwise, it drew Berge's representatives' attention to the pertinent part of the Manual or explained that it contained disclaimers.  The warranty disclaimers in the Packager Manual, as a matter of law, are not conspicuous.  GE's motion for summary judgment on this basis is denied.

*Packager Manual as a Disclaimer of Express Warranties*.— Based on the facts and law explained in the preceding sections, GE has not shown itself entitled to summary judgment regarding the disclaimers in the Packager Manual.  GE has failed to establish that there is no genuine question of material fact that the Packager Manual's provision excluding warranty for "maintenance"[103] is "reasonable as consistent" with GE's representations about "problem-free service," maximum rod load capacity, and rotational

---

[99]     *See id.*, Art. 8.6.

[100]    *See id.*, Art. 8.7.

[101]    Resp. at 36.

[102]    *See* Kristiansen Decl. ¶¶ 6-7 (citing Ex. A).

[103]    *Id.*, Art. 8.6, § 6.1.5.

speed.  *See* TEX. BUS. & COM. CODE § 2.316(a).  The evidence is also insufficient to prove that Berge had sufficient notice of the disclaimer to make it "reasonable as consistent" with GE's representations.  Summary judgment on this basis is also denied.

     ***Packager Manual as a Limitation of Damages*.—** For the same reasons discussed above, GE has failed to demonstrate that it or anyone gave notice of the Packager Manual disclaimers to Berge, and thus enforcement of the disclaimers to limit Berge's damages may be procedurally unconscionable.  *See* TEX. BUS. & COM. CODE § 2.719.  Summary judgment enforcing the Packager Manual's limitation on damages on Berge is denied.[104]

### c.     GE-Flotech Agreement and Order Acknowledgement

     GE alternatively argues that it indirectly disclaimed implied and express warranties and limited damages through disclaimers in a "chain of undisputed contracts" related to the purchase, production, and installation of the compressor modules (the Contract Chain).[105]  These agreements include, among others, the GE-Flotech Packager Agreement ("GE-Flotech Agreement"), the Purchase Order, and the Order Acknowledgement.  The GE-Flotech Agreement, which GE and Flotech signed in December 2002, limited GE's express and implied warranties[106] as well as GE's liability for consequential damages.[107]  GE issued the Order Acknowledgment of July 12, 2004 in response to Flotech's Purchase Order of June 4, 2003.[108]  The Order Acknowledgment stated: "All orders are subject to the Terms and Conditions of [the GE-Flotech] [A]greement."[109]

---

[104]     The Court does not reach the question of whether the limitation of consequential damages in the Packager Manual fails of its essential purpose in this case.

[105]     MSJ Implied at 27; MSJ Express at 24-25.

[106]     GE Ex. 16, GE-Flotech Agreement at GEOG005859-GEOG005860.

[107]     *Id.* at GEOG005849-GEOG005850.

[108]     GE Ex. 14 at GEOG249994.  The Purchase Order does not contain any language limiting GE's implied or express warranties or GE's liability for damages, nor does it cross reference the GE-Flotech Agreement.  Thus, the Purchase Order is not relevant.

[109]     GE Ex. 15 at GEOG152245.

*GE-Flotech Agreement and Order Acknowledgement as Disclaimers of Implied Warranties.*— The GE-Flotech Agreement specifically and extensively limited GE's warranties[110] and required that Flotech pass along GE disclaimers and limitations.[111] Although Flotech apparently complied with this "pass-along" requirement, as evidenced by a provision in the Flotech-Aibel contract,[112] Aibel did not do so; Aibel did not reference GE in the Aibel-Berge contract disclaimers nor otherwise communicate to Berge GE's express disclaimers. GE has not cited any evidence to contradict Berge's proof that Berge neither received nor saw the GE-Flotech Agreement, nor any disclaimers within it.[113] GE accordingly has not demonstrated that the disclaimers in the GE-Flotech Agreement were conspicuous to Berge. GE is not entitled to summary

---

[110]    Schedule C to the GE-Flotech Agreement provides:

"Maintenance or wear items such as Piston Rings, Packing Rings, Wiper Rings, Valve Plates, Valve Springs, Gaskets, O-Rings, etc. are not warrantable. Prototypes or nonstandard Manufacturers' configurations are covered under a separate agreement. Damage resulting from improper storage, neglect, extreme environmental conditions, misapplication, service and maintenance inconsistent with the operator's manual or overloading of a machine is not covered under this warranty policy . . . . For the warranty period, manufacturer shall repair or replace defective material and workmanship . . . .

THE WARRANTIES SUPPLIED UNDER THIS POLICY ARE THE EXCLUSIVE REMEDIES FOR ALL CLAIMS BASED ON FAILURE OF OR DEFECT IN EQUIPMENT OR SERVICES. ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN, ARE HEREBY DISCLAIMED AND NEGATED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE . . . .

GE Ex. 16, GE-Flotech Agreement at GEOG005859-GEOG005860.

[111]    *Id.* at GEOG005849 (providing that packager "agrees to pass on to its customers as part of the terms of Packager's contracts with its customers . . . Manufacturer's Terms and Conditions of Sale dealing with indemnity, warranty, and limitations of liability.").

[112]    *See* GE Ex. 6, Flotech-Aibel Agreement § 21.4 (providing that "Supplier or Buyer or their Subsuppliers" will not be liable towards the other party for loss of profit or revenues, losses of use, or for special, consequential, incidental, indirect, or exemplary loss or damages).

[113]    Resp. at 35; Sur-Reply at 13 (citing Berge Ex. 112, Karlesen Depo. at 65-67 (stating that Aibel received a copy of the GE-Flotech Agreement in late 2004 but did not share it with Berge, who signed its contract with Aibel in May 2004)).

judgment that the GE-Flotech Agreement disclaimer is enforceable against Berge regarding the claim of implied warranty of fitness for a particular purpose.[114]

GE also argues that its 2004 Order Acknowledgement of Flotech's purchase order for the compressors incorporated by reference the disclaimers in the 2002 GE-Flotech Agreement, and thus Berge is bound by those disclaimers.[115] Berge counters with evidence unrefuted by GE that Berge never saw the Flotech purchase order or the Order Acknowledgement.[116] Thus, GE has not shown that Berge received notice of the GE-Flotech Agreement, any disclaimers within it, or the Order Acknowledgement on which GE relies. Even if Berge had received the Order Acknowledgment, the acknowledgement contained no disclaimers. At best, it cross-referenced the GE-Flotech Agreement. GE cites no legal authority addressing circumstances analogous to those at bar in regard to the Texas U.C.C.'s conspicuousness requirement for disclaimers of implied warranties. GE has failed to demonstrate the absence of a material genuine issue of fact, and summary judgment in GE's favor is denied.[117]

***GE-Flotech Agreement and Order Acknowledgement as Disclaimers of Express Warranties.***— As noted, there is no evidence that Berge representatives were shown the GE-Flotech Agreement or the Order Acknowledgement. GE also cites no legal authority enforcing such a disclaimer of express warranties under the Texas U.C.C.'s reasonableness requirement. Summary judgment on this basis is denied.

---

[114]    GE argues that the disclaimer in the GE-Flotech Agreement is conspicuous because it is in capital letters, bold font, and a larger font size. GE Ex. 16, GE-Flotech Agreement, Sched. C. at GEOG005860. The Court does not reach the issue of whether such a clause would be sufficient had Berge received a copy or some notice of it.

[115]    MSJ Implied at 27 (citing GE Ex. 15 at GEOG152245).

[116]    Sur-Reply at 12 (citing Normann Decl. ¶ 3) ("I do not believe that I have ever seen this document [GE Ex. 15, Order Acknowledgement] before, and to the best of my knowledge no representative of Plaintiff received or reviewed a copy of this document prior to the time we obtained it from GE in discovery in this action.").

[117]    Indeed, as a matter of law, such a cross-reference is insufficient to meet the conspicuousness requirement.

*GE-Flotech Agreement and Order Acknowledgement as Limitations of Damages*.— The GE-Flotech Agreement also limits GE's potential liability by (i) excluding liability for incidental and consequential damages[118] and (ii) setting a total liability limit of not more than the agreement price of the compressors.[119]   The Order Acknowledgment for the compressors incorporated the GE-Flotech Agreement exclusion of consequential damages.[120]   As noted, Berge has produced uncontradicted evidence that it never saw and was never given a copy of the GE-Flotech Agreement or the Order Acknowledgment.[121]   GE thus has not shown that Berge had sufficient notice of the GE-Flotech Agreement limitation to make enforcement of the damages limitation procedurally fair.   GE's request for summary judgment on this basis is denied.[122]

### d.    Contract Chain

GE argues that disclaimers in the Contract Chain for the Chinguetti project foreclose Berge's breach of express and implied warranties and related damages claims.[123]   The disclaimers in the Flotech-Aibel, Aibel-Berge, and Berge-Woodside agreements are as follows:

The Flotech-Aibel Agreement of 2003 provides "[i]n no event, . . . shall Supplier or Buyer *or their Subsuppliers* be liable towards the other party for loss of profit or

---

[118]    GE Ex. 16, GE-Flotech Agreement at GEOG005849 ("Manufacturer shall not be responsible for any special, consequential, incidental, indirect, exemplary, punitive or speculative damages.").

[119]    *Id.* at GEOG005850 ("Manufacturer's total liability on all claims of any kind, whether in Agreement, warranty . . . shall not exceed the Agreement Price allocable to the Equipment or Services giving rise to the claim.").

[120]    *See* GE Ex. 15 at GEOG005850; MSJ Express at 24-25.

[121]    *See* Resp. at 35; Sur-Reply at 13 (citing Berge Ex. 112, Karlesen Depo. at 65-67); Sur-Reply at 12 (citing Normann Decl.).

[122]    The Court does not reach the question of whether—*if* Berge received the Order Acknowledgement—the GE-Flotech Agreement limitation of consequential damages, communicated only by cross-reference in the Order Acknowledgment, fails of its essential purpose in this case.

[123]    MSJ Implied at 27; MSJ Express at 22; Reply at 4.

revenues, loss of use of the Product or for any special, consequential, incidental, indirect or exemplary loss or damages.[124]   A "Subsupplier" is a "third party who has entered into an agreement with Supplier for the supply of goods or services in connection with [the] Purchase Agreement."[125]   Under this agreement, Flotech is the Supplier and GE was one of the unidentified Subsuppliers.

The Aibel-Berge Agreement of 2004 is the agreement through which Berge contracted for three compressor modules from Aibel.[126]   It capped Aibel's total liability for breach to 40% of the purchase price[127] and Aibel's "liability for rectification work" to 30% of the contract's purchase price.[128]   This agreement excluded loss of production, profit or revenues; loss of use; and special, consequential, incidental, indirect or exemplary loss or damages.[129]   GE is not mentioned in the disclaimers in this agreement.

Aibel and Berge had also entered into an Operations Contract in 2001 through which Berge hired Aibel to "manage, operate, and maintain" a processing plant onboard the *Berge Helene*.[130]   The Agreement excluded "any consequential, indirect, special, exemplary, or incidental loss or damage (including loss of production, loss of product, loss of use, delays and loss of revenue, profit, or anticipated profit) arising out of or in connection with this Contract . . . ."[131]

The last agreement is the Berge-Woodside Agreement of 2004, which limited damages for which Berge and Woodside would be liable to each other to those arising

---

[124]   GE Ex. 6, Flotech-Aibel Purchase Agreement, § 21.4 at GEOG152117 (emphasis added).

[125]   *Id.* at GEOG152103.

[126]   *See* GE Ex. 5, Aibel-Berge Agreement at BER005883.

[127]   *Id.*, Aibel-Berge Agreement Addendum, Art. 22.4 at BER005892.

[128]   *Id.*, Art. 15.1 at BER005891.

[129]   *Id.*, Art. 22.3 at BER005889; *see also* GE Ex. 7, Bjerkem Depo. at 223-24 (noting that consequential damages excluded in "a very high, high percentage" of Berge contracts as "standard terms of procurement").

[130]   GE Ex. 4, Aibel-Berge Operations Contract at BER139570.

[131]   *Id.* at BER139578.

58

from "direct and foreseeable loss and damages."[132]   This agreement provided that no party will be "liable to any other for any loss of profit, special losses or damages suffered by a Party to the Contract or any other person" and excluded "the rights of a Party to damages for indirect or consequential loss or damages."[133]

GE argues that, after *Nobility Homes*, Texas courts applying section 2.318 of the Texas Business and Commerce Code have held that so long as an end-user can sue a manufacturer without privity, an end-user may be subject to valid disclaimers and liability limits in the manufacturer's contract with the intermediary.[134]   Berge counters that GE cannot "exploit" the limitations of liability in these agreements because "Texas law does not allow a manufacturer to rely on such limitations."[135]

First, it is noted Berge is not a party to the Flotech-Aibel Agreement.   There is no evidence that Berge received a copy of that agreement or received notice of that agreement's disclaimers or limitations.   Thus, the Flotech-Aibel Agreement disclaimers or limitations were not conspicuous as to implied warranties and are not enforceable against Berge.   Further, because there is no evidence Berge was given notice of these disclaimers and limitations, it is not reasonable to enforce them against Berge regarding express warranties.   As to the damages limitation in the Flotech-Aibel Agreement, GE similarly has failed to show that Berge had sufficient notice of the limitation to make its enforcement procedurally fair.

GE was not a party to any of the Aibel-Berge or Berge-Woodside Agreements. There is accordingly a threshold question whether GE can enforce any limitations in those agreements.   As discussed above,[136] the Fifth Circuit has interpreted Texas law to hold that a final product manufacturer cannot enforce a retailer's warranty disclaimer

---

[132]     GE Ex. 1, Berge-Woodside Agreement, § 46.5(b) at BER000063.

[133]     *Id.*   Berge also assumed responsibility, as an "agent," for the acts of its subcontractors, "as if they were [those of Berge]."   *Id.* § 54.3 at BER000071.

[134]     *See* discussion *supra* p. 42.

[135]     Resp. at 36 (citing *Clark v. DeLaval*, 639 F.2d 1320, 1323-24 (5th Cir. 1981)).

[136]     *See* discussion *supra* p. 42.

against a remote buyer of a final product, but a component part manufacturer may so enforce.  *Compare Clark v. DeLaval*, 639 F.2d 1320, 1323-24 (5th Cir. 1981), *with Hininger v. Case Corp.*, 23 F.3d 124, 129 (5th Cir. 1994).  To the extent GE dealt directly with Berge and likely stands in the posture of a final product manufacturer vis à vis Berge, GE must rely either on its own valid disclaimers or the valid disclaimers of an intermediary seller or manufacturer that mentions GE explicitly or refers to GE in a comprehensible manner.  If the Court at trial finds that GE is to be treated as a final product manufacturer with respect to Berge, then GE may not rely on damages limitations in the relevant agreements comprising the Contract Chain.  None mentions GE expressly or in a manner that assists GE here.  Accordingly, the Court denies GE's motion for summary judgment regarding its defense that it is entitled to rely on others' contracts' limitations to avoid Berge's warranty and related damages claims.[137]

## IV.   CONCLUSION AND ORDER

For the foregoing reasons, it is therefore

**ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Implied Warranty Claims [Doc. # 179] is **DENIED**, it is further

**ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Express Warranty Claims [Doc. # 180] is **GRANTED in small part and DENIED in part**, and it is further

---

[137]    The Court does not discguss whether these limitations fail their essential purpose because the threshold issue is whether GE, acting like a final product manufacturer, is permitted to use against Berge limitations in the Aibel-Berge and Berge-Woodside Agreements.  In addition, whether the limitation of remedies fails its essential purpose in this case requires trial.

The Court does not hold that the limitations in the Aibel-Berge or the Berge-Woodside Agreements *per se* are inconspicuous, unreasonable, or substantively or procedurally unconscionable.  As a signatory to both agreements, Berge was on notice of the terms in these agreements. There is also no evidence of substantive unconscionability regarding the limitations on consequential damages.

**ORDERED** that Defendants' Motion for Summary Judgment on Plaintiff's Damages Claims [Doc. # 181] is **DENIED**.

SIGNED at Houston, Texas, this 16th  day of November, 2011.

Nancy F. Atlas
United States District Judge